UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA and
STATE OF WISCONSIN,

               Plaintiffs,

       v.

NORTHERN STATES POWER COMPANY,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. __17-cv-16-bbc__
Lead Case:  12-cv-565-bbc

# CONSENT DECREE BETWEEN THE UNITED STATES, WISCONSIN, AND NORTHERN STATES POWER COMPANY

**TABLE OF CONTENTS**

I.      BACKGROUND ....................................................................................................... 1

II.     JURISDICTION ...................................................................................................... 3

III.    PARTIES BOUND .................................................................................................. 3

IV.     DEFINITIONS ........................................................................................................ 4

V.      GENERAL PROVISIONS ...................................................................................... 8

VI.     PERFORMANCE OF THE WORK ....................................................................... 9

VII.    REMEDY REVIEW .............................................................................................. 11

VIII.   ACCESS AND INSTITUTIONAL CONTROLS .................................................. 12

IX.     FINANCIAL ASSURANCE ................................................................................... 15

X.      PAYMENTS FOR RESPONSE COSTS ................................................................ 19

XI.     DISBURSEMENT OF SPECIAL ACCOUNT FUNDS ........................................ 21

XII.    INDEMNIFICATION AND INSURANCE ........................................................... 25

XIII.   FORCE MAJEURE ................................................................................................ 26

XIV.    DISPUTE RESOLUTION ...................................................................................... 28

XV.     STIPULATED PENALTIES .................................................................................. 30

XVI.    COVENANTS BY PLAINTIFFS .......................................................................... 33

XVII.   COVENANTS BY SETTLING DEFENDANT ..................................................... 36

XVIII.  EFFECT OF SETTLEMENT; CONTRIBUTION .................................................. 38

XIX.    ACCESS TO INFORMATION .............................................................................. 40

XX.     RETENTION OF RECORDS ................................................................................. 41

XXI.    NOTICES AND SUBMISSIONS .......................................................................... 41

XXII.   RETENTION OF JURISDICTION ........................................................................ 43

XXIII.  APPENDICES ........................................................................................................ 44

XXIV.   MODIFICATION ................................................................................................... 44

XXV.    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ........................... 44

XXVI.   SIGNATORIES/SERVICE .................................................................................... 45

XXVII.  FINAL JUDGMENT .............................................................................................. 45

# I.    BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Wisconsin (the "State"), at the request of the Governor of Wisconsin on behalf of the Wisconsin Department of Natural Resources ("WDNR"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.    The United States and the State in the complaint seek, *inter alia*: (1) reimbursement of costs incurred by EPA and the U.S. Department of Justice ("DOJ") for response actions at the Ashland/Northern States Power Lakefront Superfund Site in Ashland, Wisconsin ("Site"), together with accrued interest; and (2) performance of response actions by Northern States Power Company, a Wisconsin Corporation ("Settling Defendant") at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

C.    In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial design and remedial action ("RD/RA") for the Site, and the States has participated in such negotiations and elected to be a party to this Consent Decree ("Consent Decree").

D.    By signing this Consent Decree, Settling Defendant does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaint, nor does it acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

E.    Settling Defendant brought suit for matters related to this Consent Decree in the case titled *Northern States Power Company v. City of Ashland*, Wisconsin, et. al., No. 12-cv-602 (W.D. Wisc.).  The decision is available at *Northern States Power Company v. City of Ashland*, 131 F. Supp. 3d 802 (W.D. Wis. 2015).

F.    Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List (NPL), set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 5, 2002, 67 Fed. Reg. 56,757-56,765.

G.    In response to a release or a substantial threat of a release of a hazardous substance(s) at or from the Site, EPA and Settling Defendant commenced on November 14, 2003, a Remedial Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430. Settling Defendant completed a Remedial Investigation ("RI") Report on February 5, 2008, and completed a Feasibility Study ("FS") Report on December 4, 2008.

H.    Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action on June 1, 2009, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral

comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Director of the Superfund Division, EPA Region 5, based the selection of the response action.

I.      The decision by EPA on the remedial action to be implemented at the Site is embodied in a final Record of Decision ("ROD"), executed on September 30, 2010, on which the State has given its concurrence. The ROD includes EPA's explanation for any significant differences between the final plan and the proposed plan as well as a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

J.      The Site includes four inter-related areas of concern: 1) sediments in Chequamegon Bay; 2) soil and shallow groundwater in Kreher Park; 3) soil and shallow groundwater in the Upper Bluff/Filled Ravine; and 4) deep groundwater in the Copper Falls Aquifer. This Consent Decree addresses the remedial design and remedial action for the sediments in the Chequamegon Bay portion of the Site ("Phase 2 Project Area"). Settling Defendant is already performing the remedy selected in the ROD for the soil and groundwater portions of the Site (items 2-4, above) under the terms of a consent decree entered on October 19, 2012 in the case *United States v. Northern States Power Co.*, No. 12-cv-00565 ("Phase 1 Consent Decree"). The Phase 1 Consent Decree also resolved claims for Natural Resource Damages as to Settling Defendant and Settling Defendant's Related Parties for the entire Site, including the portion of Chequamegon Bay within the Site, as set forth in the Phase 1 Consent Decree. The parties anticipate that this Consent Decree will be the final Consent Decree for the Site as to Settling Defendant, and that this Consent Decree will resolve Settling Defendant's liability at the Site except as set forth in Section XVIII.

K.      The ROD selected a combination of dry excavation and wet dredging (called option SED-6 in the ROD) as the sediment remedy for the Phase 2 Project Area. The ROD also provided the option of remediating all of the contaminated sediments within the Phase 2 Project Area boundaries using wet dredging, if the results of a wet dredge pilot study ("Pilot Study") demonstrate that a wet dredge remedy can meet performance standards and be successfully performed in the near-shore area.

L.      On July 15, 2015, EPA and Settling Defendant entered into an Administrative Settlement Agreement and Order on Consent for Construction of Breakwater ("Breakwater AOC") to construct a breakwater to provide wave attenuation and containment for the portion of the Site where dredge activities will take place during the Pilot Study and full-scale dredge. Construction of the breakwater was completed in late 2015.

M.      In the summer of 2016, Settling Defendant conducted the Pilot Study and demonstrated that wet dredging can be used to successfully remediate the near-shore sediment at the Phase 2 Project Area.  In accordance with the ROD, EPA published an Explanation of Significant Differences ("ESD") dated December 2016, determining that wet dredging, instead of dry excavation, may be performed for the near-shore sediments, as further described in the Statement of Work and the approved Remedial Design Work Plan.

2

N.      Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by Settling Defendant shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

O.      The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.      JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over Settling Defendant. Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendant waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. Settling Defendant shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## III.     PARTIES BOUND

2.      This Consent Decree is binding upon the United States and the State and upon Settling Defendant and its successors and assigns. Any change in ownership or corporate or other legal status of a Settling Defendant including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such Settling Defendant's responsibilities under this Consent Decree.

3.      Settling Defendant shall provide a copy of this Consent Decree to each contractor hired to perform the Work and to each person representing Settling Defendant with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree. Settling Defendant or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work. Settling Defendant shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this Consent Decree. With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with Settling Defendant within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

# IV.   DEFINITIONS

4.      Unless otherwise expressly provided in this Consent Decree, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Decree or its appendices, the following definitions shall apply solely for purposes of this Consent Decree:

"Affected Property" shall mean all real property at the Site and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or ICs are needed to implement the Remedial Action.

"Ashland/Northern States Power Special Account" shall mean the special account, within the EPA Hazardous Substances Superfund, established for the Site (Site ID B5 N5) by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"Ashland/Northern States Power Disbursement Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), and ¶ 39 (Creation of Ashland/Northern States Power Disbursement Special Account).

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXIII). In the event of conflict between this Consent Decree and any appendix, this Consent Decree shall control.

"Day" or "day" shall mean a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this Consent Decree is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this Consent Decree, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to,

4

payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 31 (Access to Financial Assurance), Section VII (Remedy Review), Section VIII (Access and Institutional Controls) (including the cost of attorney time and any monies paid to secure access and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), Section XIV (Dispute Resolution), WDNR costs billed to EPA by agreement between WDNR and EPA, and all litigation costs. Future Response Costs shall also include all Interim Response Costs, and all Interest on those Past Response Costs Settling Defendant has agreed to pay under this Consent Decree that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from October 31, 2015, to the Effective Date.

"Institutional Controls" or "ICs" shall mean restrictions, limitations, or other conditions or action taken under state laws or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices to ensure that conditions at the Phase 2 Project Area, and the rest of the Site to the extent described in Section VIII, remain protective of public health, safety, and welfare and the environment, including, but not limited, to WIS. STAT. § 292.12, that may also: (a) limit land, water, and/or resource use to minimize the potential for human exposure to Waste Material at the Site; (b) limit land, water, and/or resource use to implement, ensure non-interference with, or ensure the protectiveness of the Phase 2 Remedial Action; (c) provide information intended to modify or guide human behavior at the Phase 2 Project Area, and the rest of the Site to the extent described in Section VIII; and/or (d) require easements or covenants running with the land that (i) limit land, water, or resource use and/or provide access rights and (ii) are created pursuant to common law or statutory law by an instrument that is recorded by the owner in the appropriate land records office (which has commonly been referred to as "Proprietary Controls" by EPA).

"Institutional Control Implementation and Assurance Plan" or "ICIAP" shall mean the plan for implementing, maintaining, monitoring, and reporting on the Institutional Controls set forth in the ROD, prepared in accordance with the statement of work ("SOW").

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www2.epa.gov/superfund/superfund-interest-rates.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between October 31, 2015, and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the Phase 2 Remedial Action as required under the Operation and Maintenance Plan approved or developed by EPA pursuant to the SOW, and maintenance, monitoring, and enforcement of Institutional Controls as provided in the ICIAP.

"Paragraph" or "¶" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States, the State of Wisconsin, and Settling Defendant.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through October 31, 2015, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Phase 1 Consent Decree" shall mean the consent decree entered on October 19, 2012 in the case *United States v. Northern States Power Co.*, No. 12-cv-00565.

"Phase 1 Project Area" shall mean that area of the Site generally comprising Kreher Park; the Upper Bluff/Filled Ravine; and the Copper Falls Aquifer. The Phase 1 Project Area comprises the entire Site except for the portion of Chequamegon Bay within the Site boundary.

"Phase 2 Performance Standards" shall mean the cleanup standards for sediments in the Phase 2 Remedial Action, as set forth in the ROD, the ESD, the SOW, and the design plans and specifications developed and approved by EPA in accordance with the SOW.  The Phase 2 Performance Standards for sediments shall be established to achieve: (i) the Remedial Action Objectives ("RAOs") described in Section 8.0 of the ROD; (ii) the performance standards for selected sediment remedy described in Section 12.3 of the ROD or described in the ESD; and (iii) any ARARs identified in Appendix C of the ROD and that are identified during the Phase 2 Remedial Design.

"Phase 2 Project Area" shall mean that area of the Site located in Chequamegon Bay, and depicted in Appendix A.

"Phase 2 Remedial Action" shall mean the remedial action selected for the sediments in Chequamegon Bay by the EPA in accordance with the ROD.

"Phase 2 Remedial Design" shall mean those activities necessary to develop final plans and specifications for the Phase 2 Remedial Action as stated in the SOW.

"Plaintiffs" shall mean the United States and the State of Wisconsin.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on September 30, 2010, by the Director of the Superfund Division, EPA Region 5, and all attachments thereto. The ROD was filed with the Court in *United States v. Northern*

6

*States Power Co.*, No. 12-cv-00565 (W.D. Wisc.), Doc. No. 2, and is available on the EPA website at http://dnr.wi.gov/topic/brownfields/Ashland.html.

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

"Settling Defendant" shall mean Northern States Power Company, a Wisconsin corporation.

"Settling Defendant's Related Parties" shall mean: (i) all parents, subsidiaries, and affiliates of Settling Defendant (including, but not limited to, Xcel Energy, Inc., a Minnesota corporation; Xcel Energy Services, Inc., a Delaware corporation; Northern States Power Company, a Minnesota corporation; Southwestern Public Service Company, a New Mexico corporation; and Public Service Company of Colorado, a Colorado corporation), but only to the extent that the alleged liability of such person is based on the alleged liability of the Settling Defendant; and (ii) the former or current officers, directors, employees, general partners, limited partners, members, or shareholders of Settling Defendant and of any entity included in clause (i) of this Paragraph, but only to the extent that the alleged liability of such person is based on acts and/or omissions which occurred within the scope of the person's employment or capacity as an officer, director, employee, general partner, limited partner, member, or shareholder of the Settling Defendant or of any entity included in clause (i) of this Paragraph.

"Site" shall mean the Ashland/Northern States Power Lakefront Site, located in Ashland, Ashland County, Wisconsin, and depicted generally on the map attached as Appendix A.  The Site consists of both the Phase 2 Project Area and the Phase 1 Project Area.

"State" shall mean the State of Wisconsin and each department, agency, and instrumentality of the State of Wisconsin, including WDNR.

"Statement of Work" or "SOW" shall mean the document describing the activities Settling Defendant must perform to implement the Phase 2 Remedial Design and the Phase 2 Remedial Action regarding the Site. The SOW is attached hereto as Appendix B.

"Supervising Contractor" shall mean the principal contractor retained by Settling Defendant to supervise and direct the implementation of the Work under this Consent Decree.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.§ 6903(27), or WIS. STAT. § 289.01(33); and (4) any "hazardous substance" under WIS. STAT. § 292.01(5).

"WDNR" shall mean the Wisconsin Department of Natural Resources and its successor departments, agencies, or instrumentalities.

"WDNR Database" shall mean the publicly accessible database available on the internet as required by WIS. STAT. §§ 292.12, 292.31, and 292.57.  The WDNR Database is accessible at http://dnr.wi.gov/botw/SetUpBasicSearchForm.do.

"Work" shall mean all activities and obligations Settling Defendant is required to perform under this Consent Decree, except the activities required under Section XX (Retention of Records) and as limited by Paragraph 85.

## V.   GENERAL PROVISIONS

5.     **Objectives of the Parties**. The objectives of the Parties in entering into this Consent Decree are to protect public health or welfare or the environment by the design and implementation of response actions at the Phase 2 Project Area by Settling Defendant, to pay response costs incurred by Plaintiffs with respect to the Site, and to resolve the claims of Plaintiffs against Settling Defendant as provided in this Consent Decree.

6.     **Commitments by Settling Defendant**. Settling Defendant shall finance and perform the Work in accordance with this Consent Decree, the ROD, and all deliverables developed by Settling Defendant and approved or modified by EPA pursuant to this Consent Decree. Settling Defendant shall pay the United States for its response costs as provided in this Consent Decree.

7.     **Compliance with Applicable Law**. Nothing in this Consent Decree limits Settling Defendant's obligations to comply with the requirements of all applicable federal, state, and local laws and regulations. Settling Defendant must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.     **Permits**.

a.     As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.     Settling Defendant may seek relief under the provisions of Section XIII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work,

8

provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

      c.     This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.    PERFORMANCE OF THE WORK

     9.     **Coordination and Supervision**.

      a.     **Project Coordinators**.

      (1)     Settling Defendant's Project Coordinator must have sufficient technical expertise to coordinate the Work. Settling Defendant's Project Coordinator may not be an attorney representing Settling Defendant in this matter and may not act as the Supervising Contractor. Settling Defendant's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

      (2)     EPA shall designate and notify the Settling Defendant of its Project Coordinator[s] and Alternate Project Coordinator[s]. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

      (3)     The State shall designate and notify EPA and the Settling Defendant of its Project Coordinator[s] and Alternate Project Coordinator[s]. The State may designate other representatives, including its employees, contractors and/or consultants to oversee the Work. For any meetings and inspections in which EPA's Project Coordinator participates, the State's Project Coordinator also may participate. Settling Defendant shall notify the State reasonably in advance of any such meetings or inspections.

      (4)     Settling Defendant's Project Coordinators shall meet with EPA's and the State's Project Coordinator[s] at least monthly.

      b.     **Supervising Contractor**. Settling Defendant's proposed Supervising Contractor must have a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

  c.  **Procedures for Disapproval/Notice to Proceed**.

    (1) Settling Defendant shall designate, and notify EPA, within 10 days after the Effective Date, of the names, contact information, and qualifications of the Settling Defendant's proposed Project Coordinator and Supervising Contractor.

    (2) EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, Settling Defendant shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. Settling Defendant may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of Settling Defendant's selection.

    (3) Settling Defendant may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

  10. **Performance of Work in Accordance with SOW**. Settling Defendant shall: (a) develop the Phase 2 Remedial Design; (b) perform the Phase 2 Remedial Action; and (c) operate, maintain, and monitor the effectiveness of the Phase 2 Remedial Action; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the Consent Decree or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

  11. **Emergencies and Releases**. Settling Defendant shall comply with the emergency and release response and reporting requirements under ¶ 4.3 (Emergency Response and Reporting) of the SOW. Subject to Section XVI (Covenants by Plaintiffs), nothing in this Consent Decree, including ¶ 4.3 of the SOW, limits any authority of Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to Settling Defendant's failure to take appropriate response action under ¶ 4.3 of the SOW, EPA or, as appropriate, the State takes such action instead, Settling Defendant shall reimburse EPA and the State under Section X (Payments for Response Costs) for all costs of the response action.

  12. **Community Involvement**. If requested by EPA or WDNR, Settling Defendant shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator. Costs incurred by the United States under this Section

constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13. **Modification of SOW or Related Deliverables**.

a. If EPA, after consultation with WDNR, determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Phase 2 Performance Standards or to carry out and maintain the effectiveness of the Phase 2 Remedial Action, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW then EPA may notify Settling Defendant of such modification. If Settling Defendant objects to the modification it may, within 30 days after EPA's notification, seek dispute resolution under Section XIV.

b. The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if Settling Defendant invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this Consent Decree, and Settling Defendant shall implement all work required by such modification. Settling Defendant shall incorporate the modification into the deliverable required under the SOW, as appropriate.

c. Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

14. Nothing in this Consent Decree, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Phase 2 Performance Standards.

## VII.   REMEDY REVIEW

15. **Periodic Review**. Settling Defendant shall conduct, in accordance with ¶ 4.6 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the Phase 2 Remedial Action is protective of human health and the environment, provided, however, that no five year remedy review shall be required under this Consent Decree in the event that the remedial action permits unlimited use and unrestricted exposure of the Phase 2 Project Area within the meaning of the NCP at Part 300.430(f)(4)(ii).

16. **EPA Selection of Further Response Actions**. If EPA after consultation with WDNR, determines, at any time, that the Phase 2 Remedial Action is not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

17. **Opportunity to Comment**. Settling Defendant and, if required by Section 113(k)(2) or 117 of CERCLA, 42 U.S.C. § 9613(k)(2) or 9617, the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a

11

result of the review conducted pursuant to Section 121(c) of CERCLA, 42 U.S.C. 9621(c), and to submit written comments for the record during the comment period.

18. **Settling Defendant's Obligation to Perform Further Response Actions**. If EPA selects further response actions relating to the Site, EPA may require Settling Defendant to perform such further response actions, but only to the extent that the reopener conditions in ¶ 74 or 75 (United States' Pre- and Post-Certification Reservations) are satisfied. Settling Defendant may invoke the procedures set forth in Section XIV (Dispute Resolution) to dispute (a) EPA's determination that the reopener conditions of ¶ 74 or 75 are satisfied, (b) EPA's determination that the Phase 2 Remedial Action is not protective of human health and the environment, or (c) EPA's selection of the further response actions. Disputes regarding EPA's determination that the Phase 2 Remedial Action is not protective or EPA's selection of further response actions shall be resolved pursuant to ¶ 57 (Record Review).

19. **Submission of Plans**. If Settling Defendant is required to perform further response actions pursuant to ¶ 18, it shall submit a plan for such response action to EPA for approval in accordance with the procedures of Section VI (Performance of the Work). Settling Defendant shall implement the approved plan in accordance with this Consent Decree.

## VIII.   ACCESS AND INSTITUTIONAL CONTROLS

20. The Parties acknowledge that Settling Defendant has executed access agreements with the City of Ashland and Wisconsin Central, Ltd. (the relevant portions of which are included in Appendix C), which currently satisfy Settling Defendant's obligations to obtain access to properties owned by or in the possession of the City of Ashland and Wisconsin Central, Ltd.

21. **Access and Institutional Controls**. In the event that the City of Ashland and/or Wisconsin Central Ltd., revoke or otherwise limit the access provided by the already-executed agreements, or should additional access become necessary, Settling Defendant shall, with respect to any Non-Settling Owner's Affected Property use best efforts to secure from such Non-Settling Owner an agreement, enforceable by Settling Defendant and by Plaintiffs, providing that such Non-Settling Owner: (i) provide Plaintiffs and the Settling Defendant, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the Consent Decree, including those listed in ¶ 21.a; and (ii) refrain from using such Affected Property in any manner that EPA or WDNR determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action.

12

a.    **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)    Monitoring the Work;

(2)    Verifying any data or information submitted to the United States or the State;

(3)    Conducting investigations regarding contamination at or near the Site;

(4)    Obtaining samples;

(5)    Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)    Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)    Implementing the Work pursuant to the conditions set forth in ¶ 79 (Work Takeover);

(8)    Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendant or its agents, consistent with Section XIX (Access to Information);

(9)    Assessing Settling Defendant's compliance with the Consent Decree; and

(10)    Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Consent Decree.

(11)    Implementing, monitoring, maintaining, reporting on, and enforcing any Institutional Controls and the requirements of the ICIAP.

22.    **Access to State-Owned or Controlled Lands**.  The State shall provide Settling Defendant and EPA and their representatives, including contractors, with access at all reasonable times to that portion of the Site owned or controlled by the State to conduct any activity related to this Consent Decree.

23.    **Institutional Controls**.  If EPA, or WDNR, determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, Settling Defendant shall:

13

a.      Assist in the execution of Institutional Controls, in accordance with the Institutional Controls and Implementation and Assurance Plan under the SOW, and the continuing obligations imposed in accordance with Ch. 292, Wis. Stat., which can be included in the WDNR Database, that (i) grant a right of access to conduct any activity regarding the Consent Decree including, but not limited to, those activities listed in Paragraph 21.a, and (ii) grant the right to enforce the land/water use restrictions set forth in Paragraph 21, including, but not limited to, the specific restrictions listed in the ICIAP, and/or continuing obligations imposed in accordance with Ch. 292, Wis. Stat. The Institutional Controls shall be imposed by one or more of the following persons, as determined by EPA or WDNR: (i) the United States, on behalf of EPA, and its representatives, (ii) the State and its representatives, and/or (iii) appropriate owners, lessees and grantees. The Institutional Controls shall include a designation that EPA, WDNR and Settling Defendant as appropriate, are third party beneficiaries. EPA and/or WDNR shall maintain the right to enforce the Institutional Controls without acquiring an interest in real property. Settling Defendant shall monitor, maintain, and report on Institutional Controls if any Institutional Controls are imposed, provided that the property owner or occupier is in compliance with Ch. 292.12(5m)(ar), Wis. Stat.

b.      Provide notification to such persons of pending imposition of any applicable Institutional Controls for those properties, and placement of the relevant information in the WDNR Database.

c.      Within 15 days of the approval and acceptance of the Phase 2 Remedial Action Work Plan and issuance of an approval letter to Settling Defendant incorporating Institutional Controls, WDNR shall place any applicable Institutional Controls in the WDNR Database.

d.      Should EPA and WDNR determine that any applicable Institutional Controls require modification, Settling Defendant shall draft and finalize revised Institutional Controls as requested by EPA and WDNR. Upon request by EPA or WDNR, Settling Defendant shall use "best efforts" to execute and record easements or covenants running with the land that (a) limit land, water, or resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded by the owner in the appropriate land records office.

24.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Settling Defendant would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access, agreements, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. "Best efforts" shall not, however, include payment of money to any party that has received special notice of potential liability related to the Site, or the payment of money to the State. If Settling Defendant is unable to accomplish what is required through "best efforts" in a timely manner, it shall notify Plaintiffs, and include a description of the steps taken to comply with the requirements. If Plaintiffs deem it appropriate, they may assist Settling Defendant, or take independent action, in obtaining such Institutional Controls, agreements, releases,

14

subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by Plaintiffs in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

25.     In the event of any Transfer of the Affected Property, unless the United States and WDNR otherwise consent in writing, Settling Defendant shall continue to comply with its obligations under the Consent Decree, including its obligation to provide and/or secure access, to implement, maintain, monitor, and report on Institutional Controls as described in Paragraph 23.a, and to abide by such Institutional Controls to the extent applicable to Settling Defendant.

26.     Notwithstanding any provision of the Consent Decree, Plaintiffs retain all of their access authorities and rights, as well as all of their rights to require Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

## IX.     FINANCIAL ASSURANCE

27.     In order to ensure completion of the Work, Settling Defendant shall secure financial assurance, initially in the amount of $42,000,000 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. Settling Defendant may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a.      A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.      A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.      A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.      A demonstration by Settling Defendant that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of

15

the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee, accompanied by a standby funding commitment, which obligates Settling Defendant to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

       f.     A guarantee to fund or perform the Work executed in favor of EPA by one of the following: (1) a direct or indirect parent company of Settling Defendant; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with Settling Defendant; provided, however, that any company providing such a guarantee must demonstrate to EPA's satisfaction that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee.

    28.     Settling Defendant has selected, and EPA has found satisfactory, as an initial financial assurance a demonstration pursuant to ¶ 27.f in the form attached as Appendix D. Within 30 days after the Effective Date, Settling Defendant shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the form of financial assurance attached as Appendix D and shall submit such mechanisms and documents to the EPA Regional Financial Management Officer, to the United States, EPA, and the State as specified in Section XXI (Notices and Submissions). Settling Defendant must, within 30 days of the Effective Date:

       a.     Demonstrate that:

          (1)    the affected Settling Defendant or guarantor has:

               1.    Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

               2.    Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

               3.    Tangible net worth of at least $10 million; and

               4.    Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations

16

financially assured through the use of a financial test or guarantee; or

(2)     The affected Settling Defendant or guarantor has:

1.     A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

2.     Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

3.     Tangible net worth of at least $10 million; and

4.     Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

b.     Submit to EPA for the affected Settling Defendant or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance - Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

29.     Settling Defendant must also:

a.     Annually resubmit the documents described in ¶ 28.b within 90 days after the close of the affected Respondent's or guarantor's fiscal year;

b.     Notify EPA within 30 days after the affected Respondent or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

c.     Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the affected Respondent or guarantor in addition to those specified in ¶ 94.b; EPA may make such a request at any time based on a belief that the affected Respondent or guarantor may no longer meet the financial test requirements of this Section.

30.     Settling Defendant shall diligently monitor the adequacy of the financial assurance. If Settling Defendant becomes aware of any information indicating that the financial

17

assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, Settling Defendant shall notify EPA of such information within 7 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected Settling Defendant of such determination. Settling Defendant shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for Settling Defendant, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. Settling Defendant shall follow the procedures of ¶ 32 (Modification of Amount, Form, or Terms of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Settling Defendant's inability to secure and submit to EPA financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this Consent Decree, including, without limitation, the obligation of Settling Defendant to complete the Work in accordance with the terms of this Consent Decree.

31.     **Access to Financial Assurance**.

a.      If EPA issues a notice of implementation of a Work Takeover under ¶ 79.b, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 31.d.

b.      If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and the affected Settling Defendant fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 31.d.

c.      If, upon issuance of a notice of implementation of a Work Takeover under ¶ 79.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is provided under ¶ 27.e or 27.f, then EPA may demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. Settling Defendant shall, within 45 days of such demand, pay the amount demanded as directed by EPA.

d.      Any amounts required to be paid under this ¶ 31 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Ashland/Northern States Power Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance

18

response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e.      All EPA Work Takeover costs not paid under this ¶ 31 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

32.     **Modification of Amount, Form, or Terms of Financial Assurance**. Settling Defendant may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 27, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify Settling Defendant of its decision to accept or reject a requested reduction or change pursuant to this Paragraph. Settling Defendant may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIV (Dispute Resolution). Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by Settling Defendant pursuant to the dispute resolution provisions of this Consent Decree or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, Settling Defendant shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 27.

33.     **Release, Cancellation, or Discontinuation of Financial Assurance**. Settling Defendant may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIV (Dispute Resolution).

# X.      PAYMENTS FOR RESPONSE COSTS

34.     Within 30 days after the Effective Date, Settling Defendant shall pay to EPA $1,000,000 in payment for Past Response Costs.  Payment shall be made in accordance with ¶ 36 (Payment Instructions for Settling Defendant).

35.     **Payments by Settling Defendant for Future Response Costs**. Settling Defendant shall pay to EPA all Future Response Costs not inconsistent with the NCP.

a.      On a periodic basis, EPA will send Settling Defendant a bill requiring payment that includes an Itemized Cost Summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. Settling Defendant shall make all

payments within 30 days after Settling Defendant's receipt of each bill requiring payment, except as otherwise provided in ¶ 37, in accordance with ¶ 36 (instructions for future response cost payments).

    b.  **Deposit of Future Response Costs Payments**. The total amount to be paid by Settling Defendant pursuant to ¶ 35.a shall be deposited by EPA in the Ashland/Northern States Power Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Ashland Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site.

    36.  **Payment Instructions for Settling Defendant**. For all payments of Past Response Costs, Future Response Costs or Stipulated penalties, Settling Defendant shall make such payment by Fedwire EFT, referencing the Site/Spill ID B5 N5 and DJ number 90-11-2-08879/5. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
>   "D 68010727 Environmental Protection Agency"

At the time of any payment required to be made under this Consent Decree, Settling Defendant shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center. All notices must include references to the Site/Spill ID and DJ numbers.

    37.  **Contesting Future Response Costs**. Settling Defendant may submit a Notice of Dispute, initiating the procedures of Section XIV (Dispute Resolution), regarding any Future Response Costs billed under ¶ 35 (Payments by Settling Defendant for Future Response Costs) if Settling Defendant determines that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States pursuant to Section XXI (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If Settling Defendant submits a Notice of Dispute, Settling Defendant shall pay all uncontested Future Response Costs to the United States within 30 days after Settling Defendant's receipt of the bill requiring payment. Simultaneously, Settling Defendant shall establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that

escrow account funds equivalent to the amount of the contested Future Response Costs. Settling Defendant shall send to the United States, as provided in Section XXI (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, Settling Defendant shall pay the sums due (with accrued interest) to the United States within 7 days after the resolution of the dispute. If Settling Defendant prevails concerning any aspect of the contested costs, Settling Defendant shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to the United States within 7 days after the resolution of the dispute. Settling Defendant shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 36 (Payment Instructions for Settling Defendant). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Defendant's obligation to reimburse the United States for its Future Response Costs.

38.     **Interest**. In the event that any payment for Future Response Costs required under this Section is not made by the date required, Settling Defendant shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of Settling Defendant's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of Settling Defendant's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to ¶ 61 (Stipulated Penalty Amounts – Work).

## XI.     DISBURSEMENT OF SPECIAL ACCOUNT FUNDS

39.     **Ashland/Northern States Power Disbursement Special Account and Agreement to Disburse Funds to Settling Defendant**. Within 30 days after the Effective Date, EPA shall establish the Ashland/Northern States Power Disbursement Special Account and shall transfer $ 4,500,000 from the Ashland/Northern States Power Special Account to the Ashland/Northern States Power Disbursement Special Account. Subject to the terms and conditions set forth in this Section, EPA agrees to make the funds in the Ashland/Northern States Power Disbursement Special Account, including Interest Earned on the funds in the Ashland/Northern States Power Disbursement Special Account, available for disbursement to Settling Defendant as partial reimbursement for performance of the Work. EPA shall disburse any remaining funds from the Ashland/Northern States Power Disbursement Special Account to Settling Defendant in accordance with the procedures and milestones for phased disbursement set forth in this Section.

40.     **Timing, Amount, and Method of Disbursing Funds From the Ashland/Northern States Power Disbursement Special Account**.

a.      Within 30 days after EPA's receipt of a Cost Summary and Certification, as defined by ¶ 41.b, or if EPA has requested additional information under ¶ 41.b or a revised Cost Summary and Certification under ¶ 41.d, within 15 days after receipt of the additional information or revised Cost Summary and Certification, and subject to the conditions set forth in this Section, EPA shall disburse the funds from the Ashland/Northern States Power Disbursement Special Account at the completion of the following milestones, and in the amounts set forth below:

| Milestone | Disbursement of Funds |
|---|---|
| 1.  NSPW submits 95 percent design and places order for containment curtains. | $1,000,000 |
| 2.  NSPW commences dredging (defined to mean first dredge bucket). | $1,000,000 |
| 3.  NSPW achieves dredging 50% complete (by volume) based on remedial action plan design estimates/dredge plan. | $1,000,000 |
| 4.  NSPW commences placement of the restorative layer. | $1,000,000 |
| 5.  EPA issues certification of Phase 2 remedial action completion. | $500,000 |

EPA shall disburse the funds from the Ashland/Northern States Power Disbursement Special Account to Settling Defendant by Electronic Funds Transfer in accordance with instructions provided to EPA by Settling Defendant.

41.     **Requests for Disbursement of Special Account Funds**.

a.      Within 30 days after issuance of EPA's written confirmation that a milestone of the Work, as defined in ¶ 40 (Timing, Amount, and Method of Disbursing Funds), has been satisfactorily completed, Settling Defendant shall submit to EPA a Cost Summary and Certification, as defined in ¶ 41.b, covering the Work performed up to the date of completion of that milestone. Settling Defendant shall not include in any submission costs included in a previous Cost Summary and Certification following completion of an earlier milestone of the Work if those costs have been previously sought or reimbursed pursuant to ¶ 40.

b.      Each Cost Summary and Certification shall include a complete and accurate written cost summary and certification of the necessary costs incurred and paid by Settling Defendant for the Work covered by the particular submission, excluding costs not eligible for disbursement under ¶ 42 (Costs Excluded from Disbursement).  Each Cost Summary and Certification shall contain the following statement signed by the Chief Financial Officer of Settling Defendant, or an Independent Certified Public Accountant:

*To the best of my knowledge, after thorough investigation and review of Settling Defendant's documentation of costs incurred and paid for Work performed pursuant to this CD **[insert, as appropriate**: "up to the date of completion of milestone 1," or "between the date of completion of milestone 1 and the date of completion of milestone 2,"] I certify that the information contained in or accompanying this submission is true, accurate, and complete. I am aware that there are significant penalties for knowingly submitting false information, including the possibility of fine and imprisonment.*

c.      The Chief Financial Officer of Settling Defendant or an Independent Certified Public Accountant shall also provide EPA a list of the documents that he or she reviewed in support of the Cost Summary and Certification.  Upon request by EPA, Settling Defendant shall submit to EPA any additional information that EPA deems necessary for its review and approval of a Cost Summary and Certification.

d.      If EPA finds that a Cost Summary and Certification includes a mathematical error, costs excluded under ¶ 42 (Costs Excluded from Disbursement), costs that are inadequately documented, or costs submitted in a prior Cost Summary and Certification, it will notify Settling Defendant and provide it an opportunity to cure the deficiency by submitting a revised Cost Summary and Certification. If Settling Defendant fails to cure the deficiency within 15 days after being notified of, and given the opportunity to cure, the deficiency, EPA will recalculate Settling Defendant's costs eligible for disbursement for that submission and disburse the corrected amount to Settling Defendant in accordance with the amounts and procedures in ¶ 40 (Timing, Amount, and Method of Disbursing Funds). Settling Defendant may dispute EPA's recalculation under this Paragraph pursuant to Section XIV (Dispute Resolution). In no event shall Settling Defendant be disbursed funds from the Ashland/Northern States Power Disbursement Special Account in excess of amounts properly documented in a Cost Summary and Certification accepted or modified by EPA.

42.      **Costs Excluded from Disbursement**. The following costs are excluded from, and shall not be sought by Settling Defendant for, disbursement from the Ashland/Northern States Power Disbursement Special Account: (a) response costs paid pursuant to Section X (Payments for Response Costs); (b) any other payments made by Settling Defendant to the United States pursuant to this Consent Decree, including, but not limited to, any Interest or stipulated penalties paid pursuant to Section X (Payments for Response Costs) or XV (Stipulated Penalties); (c) attorneys' fees and costs, except for reasonable attorneys' fees and costs necessarily related to Settling Defendant's obligation to provide and/or secure access, to implement, maintain, monitor, and report on Institutional Controls to the extent described in Paragraph 23.a, and to abide by such Institutional Controls, as required by Section VIII (Access

and Institutional Controls); (d) costs of any response activities Settling Defendant perform that are not required under, or approved by EPA pursuant to, this Consent Decree; (e) costs related to Settling Defendant's litigation, settlement, development of potential contribution claims, or identification of defendants; (f) internal costs of Settling Defendant, including but not limited to, salaries, travel, or in-kind services, except for those costs that represent the work of employees of Settling Defendant directly performing the Work; (g) any costs incurred by Settling Defendant prior to the Effective Date except for approved Work completed pursuant to this Consent Decree; or (h) any costs incurred by Settling Defendant pursuant to Section XIV (Dispute Resolution).

43. **Termination of Disbursements from the Special Account**. EPA's obligation to disburse funds from the Ashland/Northern States Power Disbursement Special Account under this Consent Decree shall terminate upon EPA's determination that Settling Defendant: (a) has knowingly submitted a materially false or misleading Cost Summary and Certification; (b) has submitted a materially inaccurate or incomplete Cost Summary and Certification, and has failed to correct the materially inaccurate or incomplete Cost Summary and Certification within 15 days after being notified of, and given the opportunity to cure, the deficiency; or (c) failed to submit the Cost Summary and Certification as required by ¶ 41 (Requests for Disbursement of Special Account Funds) within 30 days (or such longer period as EPA agrees) after being notified that EPA intends to terminate its obligation to make disbursements pursuant to this Section because of Settling Defendant's failure to submit the Cost Summary and Certification as required by ¶ 41.b. EPA's obligation to disburse funds from the Ashland/Northern States Power Disbursement Special Account shall also terminate upon EPA's assumption of performance of any portion of the Work pursuant to ¶ 79 (Work Takeover), when such assumption of performance of the Work is not challenged by Settling Defendant or, if challenged, is upheld under Section XIV (Dispute Resolution). Settling Defendant may dispute EPA's termination of special account disbursements under Section XIV.

44. **Recapture of Special Account Disbursements**. Upon termination of disbursements from the Ashland/Northern States Power Disbursement Special Account under ¶ 43 (Termination of Disbursements from the Special Account), if EPA has previously disbursed funds from the Ashland/Northern States Power Disbursement Special Account for activities specifically related to the reason for termination, e.g., discovery of a materially false or misleading submission after disbursement of funds based on that submission, EPA shall submit a bill to Settling Defendant for those amounts already disbursed from the Ashland/Northern States Power Disbursement Special Account specifically related to the reason for termination, plus Interest on that amount covering the period from the date of disbursement of the funds by EPA to the date of repayment of the funds by Settling Defendant. Within 10 days after receipt of EPA's bill, Settling Defendant shall reimburse the EPA Hazardous Substance Superfund for the total amount billed. Payment shall be made in accordance with ¶ 36 (Payment Instructions for Settling Defendant). Upon receipt of payment, EPA may deposit all or any portion thereof in the Ashland/Northern States Power Special Account, the Ashland/Northern States Power Disbursement Special Account, or the EPA Hazardous Substance Superfund. The determination of where to deposit or how to use the funds shall not be subject to challenge by Settling Defendant pursuant to the dispute resolution provisions of this Consent Decree or in any other

forum. Settling Defendant may dispute EPA's determination as to recapture of funds pursuant to Section XIV (Dispute Resolution).

45.     **Balance of Special Account Funds**. After EPA issues its written Certification of Phase 2 Remedial Action Completion pursuant to this Consent Decree, and after EPA completes all disbursement to Settling Defendant in accordance with this Section, if any funds remain in the Ashland/Northern States Power Disbursement Special Account, EPA may transfer such funds to the Ashland/Northern States Power Special Account or to the EPA Hazardous Substance Superfund. Any transfer of funds to the Ashland/Northern States Power Special Account or the EPA Hazardous Substance Superfund shall not be subject to challenge by Settling Defendant pursuant to the dispute resolution provisions of this Consent Decree or in any other forum.

## XII.   INDEMNIFICATION AND INSURANCE

46.     **Settling Defendant's Indemnification of the United States and the State**.

a.      The United States and the State do not assume any liability by entering into this Consent Decree or by virtue of any designation of Settling Defendant as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). Settling Defendant shall indemnify, save, and hold harmless the United States and the State and their officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on Settling Defendant's behalf or under its control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of Settling Defendant as EPA's authorized representatives under Section 104(e) of CERCLA. Further, Settling Defendant agrees to pay the United States and the State all costs they incur including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States and the State based on negligent or other wrongful acts or omissions of Settling Defendant, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of Settling Defendant in carrying out activities pursuant to this Consent Decree. Neither Settling Defendant nor any such contractor shall be considered an agent of the United States or the State.

b.      The United States and the State, respectively, shall give Settling Defendant notice of any claim for which the United States or the State plans to seek indemnification pursuant to this ¶ 46, and shall consult with Settling Defendant prior to settling such claim.

47.     Settling Defendant covenants not to sue and agrees not to assert any claims or causes of action against the United States and the State, respectively, for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State, arising from or on account of any contract, agreement, or arrangement between Settling

25

Defendant and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Settling Defendant shall indemnify, save and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Settling Defendant and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

48.     **Insurance**. No later than 15 days before commencing any on-site Work, Settling Defendant shall secure, and shall maintain until the first anniversary after issuance of EPA's Certification of RA Completion pursuant to ¶ 4.5 (Certification of Remedial Action Completion) of the SOW, commercial general liability insurance with limits of $2 million, for any one occurrence, and automobile liability insurance with limits of $2 million, combined single limit, naming the United States and the State as additional insureds with respect to all liability arising out of the activities performed by or on behalf of Settling Defendant pursuant to this Consent Decree. In addition, for the duration of this Consent Decree, Settling Defendant shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Defendant in furtherance of this Consent Decree. Prior to commencement of the Work, Settling Defendant shall provide to EPA and the State certificates of such insurance and a copy of each insurance policy. Settling Defendant shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If Settling Defendant demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Defendant need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

## XIII.  FORCE MAJEURE

49.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Settling Defendant, of any entity controlled by Settling Defendant, or of Settling Defendant's contractors that delays or prevents the performance of any obligation under this Consent Decree despite Settling Defendant's best efforts to fulfill the obligation. The requirement that Settling Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

50.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree for which Settling Defendant intends or may intend to assert a claim of force majeure, Settling Defendant shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region

26

5, within 48 hours of when Settling Defendant first knew that the event might cause a delay. Within five days thereafter, Settling Defendant shall provide in writing to EPA and WDNR an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Settling Defendant's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of Settling Defendant, such event may cause or contribute to an endangerment to public health or welfare, or the environment. Settling Defendant shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. Settling Defendant shall be deemed to know of any circumstance of which Settling Defendant, any entity controlled by Settling Defendant, or Settling Defendant's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude Settling Defendant from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 49 and whether Settling Defendant has exercised its best efforts under ¶ 49, EPA may, in its unreviewable discretion, excuse in writing Settling Defendant's failure to submit timely or complete notices under this Paragraph.

51.     If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Consent Decree that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify Settling Defendant in writing of its decision. If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay is attributable to a force majeure, EPA will notify Settling Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

52.     If Settling Defendant elects to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution) regarding EPA's decision, it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Settling Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Settling Defendant complied with the requirements of ¶¶ 50 and 51. If Settling Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Settling Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

53.     The failure by EPA to timely complete any obligation under the Consent Decree or under the SOW is not a violation of the Consent Decree, provided, however, that if such

failure prevents Settling Defendant from meeting one or more deadlines in the SOW, Settling Defendant may seek relief under this Section.

## XIV.   DISPUTE RESOLUTION

54.      Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this Consent Decree. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of Settling Defendant that have not been disputed in accordance with this Section.

55.      A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this Consent Decree shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

56.      **Statements of Position**.

a.      In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 21 days after the conclusion of the informal negotiation period, Settling Defendant invokes the formal dispute resolution procedures of this Section by serving on the United States and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Settling Defendant. The Statement of Position shall specify Settling Defendant's position as to whether formal dispute resolution should proceed under ¶ 57 (Record Review) or 58.

b.      Within 21 days after receipt of Settling Defendant's Statement of Position, EPA will serve on Settling Defendant its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 57 (Record Review) or 58. Within ten days after receipt of EPA's Statement of Position, Settling Defendant may submit a Reply.

c.      If there is disagreement between EPA and Settling Defendant as to whether dispute resolution should proceed under ¶ 57 (Record Review) or 58, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if Settling Defendant ultimately appeals to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 57 and 58.

57.      **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the

28

adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent Decree, and the adequacy of the performance of response actions taken pursuant to this Consent Decree. Nothing in this Consent Decree shall be construed to allow any dispute by Settling Defendant regarding the validity of the ROD's provisions.

       a.      An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

       b.      The Director of the Superfund Division, EPA Region 5, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 57.a. This decision shall be binding upon Settling Defendant, subject only to the right to seek judicial review pursuant to ¶¶ 57.c and 57.d.

       c.      Any administrative decision made by EPA pursuant to ¶ 57.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by Settling Defendant with the Court and served on all Parties within 10 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to Settling Defendant's motion.

       d.      In proceedings on any dispute governed by this Paragraph, Settling Defendant shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 57.a.

    58.    Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

       a.      The Director of the Superfund Division, EPA Region 5, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 56. The Superfund Division Director's decision shall be binding on Settling Defendant unless, within 10 days after receipt of the decision, Settling Defendant files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree. The United States may file a response to Settling Defendant's motion.

       b.      Notwithstanding ¶ N (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

59.     The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of Settling Defendant under this Consent Decree, except as provided in ¶ 37 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 67. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that Settling Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XV (Stipulated Penalties).

## XV.   STIPULATED PENALTIES

60.     Settling Defendant shall be liable for stipulated penalties in the amounts set forth in ¶¶ 61 and 62 to the United States for failure to comply with the requirements of this Consent Decree specified below, unless excused under Section XIII (Force Majeure). "Compliance" by Settling Defendant shall include completion of all activities and obligations, including payments, required under this Consent Decree, or any deliverable approved under this Consent Decree, in accordance with all applicable requirements of law, this Consent Decree, the SOW, and any deliverables approved under this Consent Decree and within the specified time schedules established by and approved under this Consent Decree.

61.     Stipulated Penalty Amounts - Work (Including Payments and Excluding Deliverables).

        a.      The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 61.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $ 1,000 |
| 15th through 30th day | $ 1,500 |
| 31st day and beyond | $ 3,000 |

        b.      Compliance Milestones.

                (1)     Failure to timely submit or resubmit the Intermediate (60%), Pre-final (95%), or Final Remedial Design;

                (2)     Failure to timely submit or resubmit the Phase 2 Remedial Action Work Plan;

                (3)     Failure to timely initiate Phase 2 Remedial Action Construction or to complete the Phase 2 Remedial Action;

                (4)     Failure to timely submit, resubmit, or implement the Operation and Maintenance Plan, if applicable;

                (5)     Failure to submit, resubmit, or implement the Institutional Control Implementation and Assurance Plan, if applicable, and as limited by Paragraph23.a;

30

(6)     Failure to establish or maintain the required performance guarantee pursuant to Section IX of this Consent Decree;

(7)     Failure to make best efforts to obtain or to provide access or to execute the required Institutional Controls and submit them to WDNR pursuant to Section VIII of this Consent Decree;

(8)     Failure to timely make payment of Past Response Costs or Future Response Costs pursuant to Section X of this Consent Decree; and

(9)     Failure to initiate or complete any further response actions EPA selects for the Phase 2 Project Area pursuant to Paragraph 16 of this Consent Decree.

62.     **Stipulated Penalty Amounts - Deliverables**.

a.     **Material Defects**. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of ¶ 60, unless the defect is timely cured pursuant to ¶ 6.6(b) (Resubmissions) of the SOW. The provisions of Section XIV (Dispute Resolution) and Section XV (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding Settling Defendant's submissions under this Consent Decree.

b.     The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables not listed in ¶ 61 pursuant to the Consent Decree:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $ 500 |
| 15th through 30th day | $ 1,000 |
| 31st day and beyond | $ 2,000 |

63.     In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 79 (Work Takeover), Settling Defendant shall be liable for a stipulated penalty in the amount of $ 1.5 million. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 31 (Access to Financial Assurance) and 79 (Work Takeover).

64.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Defendant of any deficiency; (b) with respect to a decision by the Director of the Superfund Division, EPA Region 5, under ¶ 57.b or 58.a of Section XIV (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that Settling Defendant's reply to EPA's Statement of Position is received

31

until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIV (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

65.     Following EPA's determination that Settling Defendant has failed to comply with a requirement of this Consent Decree, EPA may give Settling Defendant written notification of the same and describe the noncompliance. EPA may send Settling Defendant a written demand for payment of the penalties.  However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Settling Defendant of a violation.

66.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after Settling Defendant's receipt from EPA of a demand for payment of the penalties, unless Settling Defendant invokes the Dispute Resolution procedures under Section XIV (Dispute Resolution) within the 30-day period.  All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 36 (Payment Instructions for Settling Defendant).

67.     Penalties shall continue to accrue as provided in ¶ 63 during any dispute resolution period, but need not be paid until the following:

        a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

        b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, Settling Defendant shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 67.c;

        c.      If the District Court's decision is appealed by any Party, Settling Defendant shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to Settling Defendant to the extent that it prevails.

68.     If Settling Defendant fails to pay stipulated penalties when due, Settling Defendant shall pay Interest on the unpaid stipulated penalties as follows: (a) if Settling Defendant has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 66 until the date of payment; and (b) if Settling Defendant fails to timely invoke dispute resolution, Interest shall accrue from the date of demand

under ¶ 65 until the date of payment. If Settling Defendant fails to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

69.     The payment of penalties and Interest, if any, shall not alter in any way Settling Defendant's obligation to complete the performance of the Work required under this Consent Decree.

70.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of Settling Defendant's violation of this Consent Decree or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), and Chapters 289, 291, and 292 of the Wisconsin Statutes, provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this Consent Decree, except in the case of a willful violation of this Consent Decree.

71.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

## XVI.   COVENANTS BY PLAINTIFFS

72.     **Covenants for Settling Defendant by United States**. Except as provided in ¶¶ 74, 75 (United States' Pre- and Post-Certification Reservations), 77 (General Reservations of Rights), 78 (Reservation of Rights for Dry Excavation) and 80, the United States covenants not to sue or to take administrative action against Settling Defendant or Settling Defendant's Related Parties pursuant to Sections 106 and 107(a) of CERCLA and Section 7003 of RCRA, 42 U.S.C. § 6973, relating to the Site. Except with respect to future liability, these covenants shall take effect upon the Effective Date. With respect to future liability, these covenants shall take effect upon Certification of Phase 2 Remedial Action Completion by EPA pursuant to ¶ 4.5 (Certification of RA Completion) of the SOW. These covenants are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree. These covenants extend only to Settling Defendant and do not extend to any other person.

73.     **Covenants for Settling Defendant by the State**. In consideration of the action that will be performed and the payments that will be made by Settling Defendant under this Consent Decree, and except as specifically provided in ¶ 77 (General Reservations of Rights) and 78 (Reservation of Rights for Dry Excavation), the State covenants not to sue or to take administrative action against Settling Defendant or Settling Defendant's Related Parties pursuant to Section 107(a) of CERCLA and Wisconsin statutory or common law relating to the Site. These covenants are conditioned upon the satisfactory performance by Settling Defendant of its obligations under this Consent Decree. These covenants not to sue extend only to Settling Defendant and do not extend to any other person.

33

74.     **United States' Pre-Certification Reservations**. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendant to perform further response actions relating to the Phase 2 Project Area and/or to pay the United States for additional costs of response if, (a) prior to Certification of Phase 2 Remedial Action Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the remedial action is not protective of human health or the environment.

75.     **United States' Post-Certification Reservations**. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendant to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) subsequent to Certification of Phase 1 Remedial Action Completion and Certification of Phase 2 Remedial Action Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the remedial action at the Site is not protective of human health or the environment.

76.     For purposes of ¶ 74 (United States' Pre-Certification Reservations), the information and the conditions known to EPA will include only that information and those conditions known to EPA as of the Effective Date of this Consent Decree. For purposes of ¶ 75 (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Certification of Phase 2 Remedial Action Completion and set forth in the ROD, the administrative record supporting the ROD, the post-ROD administrative record, or in any information received by EPA pursuant to the requirements of this Consent Decree prior to Certification of Phase 2 Remedial Action Completion.

77.     **General Reservations of Rights**. The United States and the State reserve and this Consent Decree is without prejudice to, all rights against Settling Defendant with respect to all matters not expressly included within Plaintiffs' covenants. Notwithstanding any other provision of this Consent Decree, the United States and the State reserve all rights against Settling Defendant with respect to:

        a.      liability for failure by Settling Defendant to meet a requirement of this Consent Decree or the Phase I Consent Decree;

        b.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

34

c.      liability based on the ownership of the Site by Settling Defendant when such ownership commences after signature of this Consent Decree by Settling Defendant;

d.      liability based on the operation of the Site by Settling Defendant when such operation commences after signature of this Consent Decree by Settling Defendant and does not arise solely from Settling Defendant's performance of the Work;

e.      liability based on Settling Defendant's transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this Consent Decree by Settling Defendant;

f.      criminal liability;

g.      liability for violations of federal or state law that occur during or after implementation of the Work; and

h.      liability, prior to achievement of Phase 2 Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Phase 2 Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables).

78.      **Reservation of Rights for Dry Excavation.**  Notwithstanding any other provision of this Consent Decree, the United States and the State reserve, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel Settling Defendant to perform or finance dry excavation at the Phase 2 Project Area in the event that EPA, in consultation with the State, determines that achievement of the Phase 2 Performance Standards is impracticable without the use of dry excavation.

79.      **Work Takeover**.

a.      In the event EPA determines that Settling Defendant: (1) has ceased implementation of any portion of the Work; (2) is seriously or repeatedly deficient or late in its performance of the Work; or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice"), after consultation with WDNR, to Settling Defendant. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide Settling Defendant a period of 30 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.      If, after expiration of the 30-day notice period specified in ¶ 79.a, Settling Defendant has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify Settling Defendant in writing (which writing may be electronic) if EPA

35

determines that implementation of a Work Takeover is warranted under this ¶ 79.b. Funding of Work Takeover costs is addressed under ¶ 31 (Access to Financial Assurance).

c.    Settling Defendant may invoke the procedures set forth in ¶ 57 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 79.b. However, notwithstanding Settling Defendant's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 79.b until the earlier of (1) the date that Settling Defendant remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 57 (Record Review) requiring EPA to terminate such Work Takeover.

80.    Notwithstanding any other provision of this Consent Decree, the United States and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

## XVII. COVENANTS BY SETTLING DEFENDANT

81.    **Covenants by Settling Defendant**. Subject to the reservations in ¶ 83, Settling Defendant covenants not to sue and agrees not to assert any claims or causes of action against the United States or the State with respect to the Site, the Work, and this Consent Decree, including, but not limited to:

a.    any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA § 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

b.    any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Site for the Work, past response actions regarding the Site, Past Response Costs, Future Response Costs, and this Consent Decree; or

c.    any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Wisconsin Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law; or

d.    any direct or indirect claim for disbursement from the Ashland/Northern States Power Special Account or Ashland/Northern States Power Disbursement Special Account, except as provided in Section XI (Disbursement of Special Account Funds).

82.    Except as provided in ¶¶ 86 (Waiver of Claims by Settling Defendant) and 93 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States or the State brings a cause of action or issues an order pursuant to any of the reservations in Section XVI (Covenants by Plaintiffs), other than in ¶¶ 77.a (claims for failure to meet a requirement of the Consent Decree), 77.f (criminal liability), and 77.g (violations of federal/state law during or after implementation of the Work), but only to the extent that Settling Defendant's claims arise from the same response action, response costs, or damages that the United States or the State is seeking pursuant to the applicable reservation.

36

83.     Settling Defendant reserves, and this Consent Decree is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of Settling Defendant's deliverables or activities.

84.     Nothing in this Consent Decree shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

85.     This Consent Decree does not obligate Settling Defendant to perform or finance dry excavation at the Phase 2 Project Area.  Settling Defendant reserves its right to object to any action by EPA or the State that would request Settling Defendant to perform or finance dry excavation at the Phase 2 Project Area.

86.     **Waiver of Claims by Settling Defendant**.

a.     Settling Defendant agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that it may have:

(1)     **De Micromis Waiver.** For all matters relating to the Site against any person where the person's liability to Settling Defendant with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

(2)     **MSW Waiver**. For all matters relating to the Site against any person where the person's liability to Settling Defendants with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of MSW at the Site, if the volume of MSW disposed, treated, or transported by such person to the Site did not exceed 0.2% of the total volume of waste at the Site.

37

b.     **Exceptions to Waivers**.

(1)     The waivers under this ¶ 86 shall not apply with respect to any defense, claim, or cause of action that Settling Defendant may have against any person otherwise covered by such waivers if such person asserts a claim or cause of action relating to the Site against such Settling Defendant.

(2)     The waiver under ¶ 86.a (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

87.     Settling Defendant agrees not to seek judicial review of the final rule listing the Site on the NPL claiming that changed site conditions resulting from the performance of the Work in any way affected the basis for listing the Site.

## XVIII.     EFFECT OF SETTLEMENT; CONTRIBUTION

88.     Except as provided in ¶ 86 (Waiver of Claims by Settling Defendant), nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. Except as provided in Section XVII (Covenants by Settling Defendant), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

89.     The Parties agree, and by entering this Consent Decree this Court finds, that this Consent Decree constitutes a judicially-approved settlement pursuant to which Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree are all response actions taken or to be taken and all response costs incurred or to be incurred, at or in

38

connection with the Site, by the United States or any other person; provided, however, that if the United States exercises rights under the reservations in Section XVI (Covenants by Plaintiffs), other than in ¶¶ 77.a (claims for failure to meet a requirement of the Consent Decree), 77.f (criminal liability), or 77.g (violations of federal/state law during or after implementation of the Work), the "matters addressed" in this Consent Decree will no longer include those response costs or response actions that are within the scope of the exercised reservation.

90.     The Parties further agree, and by entering this Consent Decree this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

91.     Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Consent Decree, notify the United States and the State in writing no later than 60 days prior to the initiation of such suit or claim.

92.     Settling Defendant shall, with respect to any suit or claim brought against it for matters related to this Consent Decree, notify in writing the United States and the State within 10 days after service of the complaint on Settling Defendant. In addition, Settling Defendant shall notify the United States and the State within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

93.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Settling Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XVI (Covenants by Plaintiffs).

# XIX.   ACCESS TO INFORMATION

94.     Settling Defendant shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within Settling Defendant's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Consent Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. Settling Defendant shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

39

95.     **Privileged and Protected Claims**.

a.      Settling Defendant may assert that all or part of a Record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the Record, provided Settling Defendant comply with ¶ 95.b, and except as provided in ¶ 95.c.

b.      If Settling Defendant asserts a claim of privilege or protection, it shall provide Plaintiffs with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, Settling Defendant shall provide the Record to Plaintiffs in redacted form to mask the privileged or protected portion only. Settling Defendant shall retain all Records that it claims to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the Settling Defendant's favor.

c.      Settling Defendant may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that Settling Defendant is required to create or generate pursuant to this Consent Decree.

96.     **Business Confidential Claims**. Settling Defendant may assert that all or part of a Record provided to Plaintiffs under this Section or Section XX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Settling Defendant shall segregate and clearly identify all Records or parts thereof submitted under this Consent Decree for which Settling Defendant asserts business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified Settling Defendant that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Settling Defendant.

97.     If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Consent Decree.

98.     Notwithstanding any provision of this Consent Decree, Plaintiffs retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XX.   RETENTION OF RECORDS

99.    Until 10 years after EPA's Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW, Settling Defendant shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that Settling Defendant must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. Settling Defendant must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that Settling Defendant (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

100.    At the conclusion of this record retention period, Settling Defendant shall notify the United States and the State at least 90 days prior to the destruction of any such Records, and, upon request by the United States or the State, and except as provided in ¶ 95 (Privileged and Protected Claims), Settling Defendant shall deliver any such Records to EPA or the State.

101.    Settling Defendant certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XXI.  NOTICES AND SUBMISSIONS

102.    All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this Consent Decree must be in writing unless otherwise specified. Whenever, under this Consent Decree, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the addresses specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, need not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the Consent Decree regarding such Party.

**As to the United States**:

EES Case Management Unit
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
eescdcopy.enrd@usdoj.gov
Re: DJ # 90-11-2-08879/5

**As to EPA**:

Douglas Ballotti
Acting Division Director
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd. (SR-6J)
Chicago, IL 60604-3590

**and**:

Scott Hansen
EPA Project Coordinator
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd. (SR-6J)
Chicago, IL 60604-3590
(312) 886-1999
Hansen.Scott@epa.gov

**As to the Regional Financial
Management Officer**:

Richard Hackley
United States Environmental Protection Agency
Region 5
77 W. Jackson Blvd.
Mail Code: MF-10J
Chicago, IL 60604-3507

**At to EPA Cincinnati Finance
Center**:

EPA Cincinnati Finance Center
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268
cinwd_acctsreceivable@epa.gov

42

| | |
|---|---|
| **As to the State**: | Attorney Jessica L. Kramer<br>Bureau of Legal Services<br>Wisconsin DNR<br>P.O. Box 7921<br>101 S. Webster Street<br>Madison, WI 53707-7921 |
| **As to WDNR:** | Jamie Dunn<br>WDNR Project Manager<br>810 West Maple Street<br>Spooner, WI 54861 |
| **As to Settling Defendant**: | Eric Ealy<br>Xcel Energy Services, Inc., on behalf of NSPW<br>250 Marquette Plaza<br>Minneapolis, MN  55401 |
| | Kristen Shults Carney<br>Assistant General Counsel<br>Xcel Energy Services, Inc., on behalf of NSPW<br>1800 Larimer<br>11th Floor<br>Denver, CO 80202 |

## XXII. RETENTION OF JURISDICTION

103.     This Court retains jurisdiction over both the subject matter of this Consent Decree and Settling Defendant for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIV (Dispute Resolution).

## XXIII.        APPENDICES

104.     The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the description and/or map of the Site.

"Appendix B" is the SOW.

"Appendix C" contains the access agreements.

"Appendix D" is the financial assurance.

## XXIV.        MODIFICATION

105.    Except as provided in ¶ 13 (Modification of SOW or Related Deliverables), material modifications to this Consent Decree, including the SOW, shall be in writing, signed by the United States and Settling Defendant, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this Consent Decree, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and Settling Defendant. All modifications to the Consent Decree, other than the SOW, also shall be signed by the State, or a duly authorized representative of the State, as appropriate. A modification to the SOW shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

106.    Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this Consent Decree.

## XXV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

107.    This Consent Decree shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations that indicate that the Consent Decree is inappropriate, improper, or inadequate. Settling Defendant consents to the entry of this Consent Decree without further notice.

108.    If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXVI.        SIGNATORIES/SERVICE

109.    Each undersigned representative of Settling Defendant and the State, as well as the Deputy Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

110.    Settling Defendant agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified Settling Defendant in writing that it no longer supports entry of the Consent Decree.

111.    Settling Defendant shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this Consent Decree. Settling Defendant agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local

44

rules of this Court, including, but not limited to, service of a summons. Settling Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXVII.    FINAL JUDGMENT

112.    This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the Consent Decree. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

113.    Upon entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States, the State, and Settling Defendant. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 1st DAY OF March 2017

_Barbara B. Crabb_
United States District Judge

45

*Signature Page for Consent Decree regarding the Ashland Superfund Site*

**FOR THE UNITED STATES OF AMERICA:**

1/9/17
Date

Bruce S. Gelber
Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

Thomas A. Benson
Senior Attorney
Sumona N. Majumdar
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611

John W. Vaudreuil
United States Attorney
Western District of Wisconsin

Leslie K. Herje
Assistant United States Attorney
Western District of Wisconsin
222 West Washington Avenue
Suite 700
Madison, WI 53703

46

*Signature Page for Consent Decree regarding the Ashland Superfund Site*

12/28/2016
Date

Douglas Ballotti
Acting Division Director
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd.
Chicago, IL 60604-3590

12/28/2016
Date

T. Leverett Nelson
Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd.
Chicago, IL 60604-3590

12/21/2016
Date

Craig Melodia
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd.
Chicago, IL 60604-3590

*Signature Page for Consent Decree regarding the Ashland Superfund Site*

**FOR THE STATE OF WISCONSIN**

1-6-17
_____
Date

*El Eble*
_____
Cathy Stepp
Secretary, Wisconsin Department of Natural Resources
101 S. Webster Street
Madison, WI 53707-7921


Brad D. Schimel
Attorney General

Jan. 6, 2017
_____
Date

*Lorraine C Stoltzfus*
_____
Lorraine C. Stoltzfus
Assistant Attorney General
State Bar # 1003676
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857

*Signature Page for Consent Decree regarding the Ashland Superfund Site*

**FOR NORTHERN STATES POWER COMPANY,
A WISCONSIN CORPORATION:**

*12/19/16*
Dated

Name (print): Mark E. Stoering
Title:  President, NSPW
Address:  1414 West Hamilton Ave, P.O. Box
Eau Claire, Wisconsin  54702-0008

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

| | |
|---|---|
| Company: | CSC Lawyers Incorporating Service Company |
| Address: | 8040 Excelsior Drive, Suite 400 |
| | Madison, WI 53717 |
| Phone: | (608) 824-7000 |

49

# APPENDIX A



Phase 2 Project Area

Ashland

**NOTES:**
1. Basemap supplied by Esri and its data suppliers.

This drawing is neither a legally recorded map nor a survey and is not intended to be used as one. This drawing is a compilation of records, information and data used for reference purposes only.

N

**Foth** | **Envirocon**
Joint Venture

0    250    500
Feet

**NORTHERN STATES POWER COMPANY**

**FIGURE 1-1**

ASHLAND/NSP LAKEFRONT SITE
PHASE 2 PROJECT AREA

| Date: DECEMBER 2016 | Revision Date: | |
|---|---|---|
| Drawn By: DAT | Checked By: SDG | Project ID: 16X002 |

Path: X:\FOTH\IE\Xcel Energy\16X002-00\GIS\mxd\95 Percent Wet Dredge Design\Figure 1-1 Project Location.mxd    Date: 12/20/2016

# APPENDIX B

**REMEDIAL DESIGN/REMEDIAL ACTION**

**STATEMENT OF WORK**

**PHASE 2**

**ASHLAND/NORTHERN STATES POWER LAKEFRONT SUPERFUND SITE**

**Ashland, Ashland County, State of Wisconsin**

**EPA Region 5**

# TABLE OF CONTENTS

1.    INTRODUCTION ................................................................................................................1
2.    COMMUNITY INVOLVEMENT ....................................................................................3
3.    REMEDIAL DESIGN .........................................................................................................4
4.    REMEDIAL ACTION.........................................................................................................6
5.    REPORTING ......................................................................................................................10
6.    DELIVERABLES ...............................................................................................................11
7.    SCHEDULES ......................................................................................................................22
8.    STATE PARTICIPATION ..............................................................................................24
9.    REFERENCES ...................................................................................................................24

# 1.    INTRODUCTION

**1.1    Purpose of the SOW**. This Statement of Work (SOW) sets forth the procedures and requirements for implementing the Work.

**1.2    Structure of the SOW**.

- Section 2 (Community Involvement) sets forth EPA's, WDNR's, and Settling Defendant's responsibilities for community involvement.

- Section 3 (Remedial Design) sets forth the process for developing the Remedial Design, which includes the submission of specified primary deliverables.

- Section 4 (Remedial Action) sets forth requirements regarding the completion of the Remedial Action, including primary deliverables related to completion of the Remedial Action.

- Section 5 (Reporting) sets forth Settling Defendant's reporting obligations.

- Section 6 (Deliverables) describes the content of the supporting deliverables and the general requirements regarding Settling Defendant's submission of, and EPA's review of, approval of, comment on, and/or modification of, the deliverables.

- Section 7 (Schedules) sets forth the schedule for submitting the primary deliverables, specifies the supporting deliverables that must accompany each primary deliverable, and sets forth the schedule of milestones regarding the completion of the Remedial Action.

- Section 8 (State Participation) addresses State participation.

- Section 9 (References) provides a list of references, including URLs.

**1.3    The Scope of the Remedy.**  The Phase 2 wet dredge project will be performed to achieve cleanup goals and performance standards for the sediments at the Site, as described in the September 2010 ROD, and the ESD issued on December 15, 2016.  Total polynuclear aromatic hydrocarbon (tPAH)-impacted sediments will be dredged and transported to shore, offloaded and managed on-site, and then transported for off-site disposal.

The following key components shall provide the framework for the remedial design, with further information described in the Remedial Design Work Plan, and the final details to be addressed in the 100% design:

- **Barrier System:**  Prior to sediment removal, a series of water quality barriers shall be deployed to control the transport and migration of sediment contaminants of concern ("COCs") from the dredge area, and other potential water impacts, such as surface sheens, during dredging.  Such barrier system is contemplated to include closure of the east and west gaps in the Breakwater, as well as a curtain barrier system.

- **Wet Dredge Area:**  The dredge area will be defined by the extent of impacted sediment in excess of the 9.5 mg/kg RAL, and divided into multiple dredge

management units (DMUs).  Sediments with NAPL, or tPAH concentrations exceeding the RAL of 9.5 parts per million (ppm) tPAH will be targeted for removal. The specific boundary areas will be determined based on existing sediment data, including the 2016 pre-design investigation work.

- Debris removal activities will include the clearing of objects and obstructions from the Phase 2 Wet Dredge Area prior to dredging activities.  The type of equipment used for debris removal will be similar to that used for the Wet Dredge Pilot and will be further described in the design reports.  Equipment types considered may include: an excavator equipped with a grapple, thumb, or rake attachment; a standard dredge bucket; or an environmental bucket, as appropriate.

- Sediment dredging activities can be considered in two categories: mechanical and hydraulic.  Mechanical dredging will be conducted following, or coinciding with, debris removal and is the primary means to remove impacted sediment inventory within the Phase 2 Wet Dredge Area.

- **Post-Dredge Confirmation Sampling:**  Post-dredge confirmation samples will be collected from random locations in each of the DMAs.  Post-dredge confirmation samples will be collected following the completion of all inventory and any residual (if necessary) dredging passes.  Based on the results of the post-dredge confirmation sampling, several possible actions may be taken.  The post-dredge confirmation sampling procedures will be similar to those set forth in the 2016 Wet Dredge Pilot Study.  The specific response steps will be further defined in the RDWP and final 100% Design.

- **Water Quality Monitoring:**  To assess water quality conditions during the Phase 2 Wet Dredge operations, monitoring will be performed at compliance locations lakeside of the breakwater structure and sentinel locations landside of the breakwater structure.  Exceedances observed above Alert or Action Levels will trigger the initiation of specific response steps that will be defined in the Phase 2 Wet Dredge Monitoring Plan (an appendix of the 100% Design).

- **Air Quality Monitoring:**  Air quality during on-the water operations and processing of sediment will be monitored during the Phase 2 Wet Dredge operations to ensure applicable ARARs are not exceeded.  Monitoring equipment and methods will be similar to that used for the 2016 Wet Dredge Pilot Study.  Activities that were not a significant source of off-site odors during the Pilot Study will be conducted similarly during the full-scale Phase 2 Wet Dredge.  It is recognized that odors can be present even if air emissions are below ambient and workspace air action levels developed from ARARs (and therefore well below any human health concern).  The Remedial Design Work Plan identifies additional odor control measures to address community concerns, if any, related to odors.

2

**1.4**   The terms used in this SOW that are defined in CERCLA, in regulations promulgated under CERCLA, or in the Consent Decree (CD), have the meanings assigned to them in CERCLA, in such regulations, or in the CD, except that the term "Paragraph" or "¶" means a paragraph of the SOW, and the term "Section" means a section of the SOW, unless otherwise stated.

## 2.    COMMUNITY INVOLVEMENT

**2.1**   **Community Involvement Responsibilities**

(a)    EPA and WDNR have the lead responsibility for developing and implementing community involvement activities at the Site.  Previously during the RI/FS phase, EPA and WDNR developed a Community Involvement Plan (CIP) for the Site.  Pursuant to 40 C.F.R. § 300.435(c), EPA and WDNR shall review the existing CIP and determine whether it should be revised to describe further public involvement activities during the Work that are not already addressed or provided for in the existing CIP.

(b)    If requested by EPA and WDNR, Settling Defendant shall participate in community involvement activities, including participation in (1) the preparation of information regarding the Work for dissemination to the public, with consideration given to including mass media and/or Internet notification, and (2) public meetings that may be held or sponsored by EPA and WDNR to explain activities at or relating to the Site.  Settling Defendant's support of EPA's and WDNR's community involvement activities may include providing online access to initial submissions and updates of deliverables to (1) any Community Advisory Groups, (2) any Technical Assistance Grant recipients and their advisors, and (3) other entities to provide them with a reasonable opportunity for review and comment.  EPA may describe in its CIP Settling Defendant's responsibilities for community involvement activities.  All community involvement activities conducted by Settling Defendant at EPA's and WDNR's request are subject to EPA's and WDNR's oversight.  Upon EPA's request, Settling Defendant shall establish a community information repository at or near the Site to house one copy of the administrative record.

(c)    **Settling Defendant's CI Coordinator**.  If requested by EPA, Settling Defendant shall, within [15] days, designate and notify EPA of Settling Defendant's Community Involvement Coordinator (Settling Defendant's CI Coordinator).  Settling Defendant may hire a contractor for this purpose.  Settling Defendant's notice must include the name, title, and qualifications of the Settling Defendant's CI Coordinator.  Settling Defendant's CI Coordinator is responsible for providing support regarding EPA's and WDNR's community involvement activities, including coordinating with EPA's CI Coordinator regarding responses to the public's inquiries about the Site.

# 3.     REMEDIAL DESIGN

**3.1     Pre-Design Investigation Work Plan**.  On July 18, 2016, EPA, in consultation with WDNR, approved the Pre-Design Investigation Work Plan submitted by Settling Defendant.  On November 23, 2016, EPA, in consultation with WDNR, approved the Supplemental Pre-Design Investigation Work Plan submitted by Settling Defendant.  Copies of the approved PDI Work Plan and Supplemental PDI Work Plan are attached hereto as Appendix A.

**3.2     Remedial Design Work Plan**.  On December 19, 2016, EPA, in consultation with WDNR, approved the Remedial Design Work Plan submitted by Settling Defendant.

**3.3**     Settling Defendant shall meet regularly with EPA and WDNR to discuss design issues as necessary, as directed or determined by EPA or WDNR.

**3.4     Treatability Study**

(a)     If necessary, Settling Defendant shall perform a Treatability Study (TS) for the purpose of evaluating potential changes to dredged material handling or water treatment.

(b)     If EPA determines that a treatability study is required, Settling Defendant shall submit a TS Work Plan (TSWP) for EPA approval.  Settling Defendant shall prepare the TSWP in accordance with EPA's *Guide for Conducting Treatability Studies under CERCLA, Final* (Oct. 1992), as supplemented for Remedial Design by the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995).

(c)     Following completion of the TS, Settling Defendant shall submit a TS Evaluation Report for EPA comment.

(d)     EPA may require Settling Defendant to supplement the TS Evaluation Report and/or to perform additional treatability studies if EPA determines that additional treatability testing is required.

**3.5     Intermediate (60%) Remedial Design**.  If required by EPA, Settling Defendant shall submit an Intermediate (60%) Remedial Design for EPA's comment.  The Intermediate Remedial Design must include:

(a)     Plans for implementing all Remedial Design activities identified in this SOW, in the RDWP, or required by EPA to be conducted to develop the Remedial Design;

(b)     A description of the overall management strategy for performing the Remedial Design, including a proposal for phasing of design and construction, if applicable;

(c)     A description of the proposed general approach to contracting, construction, operation, maintenance, and monitoring of the Remedial Action as necessary to implement the Work;

(d)     A description of the responsibility and authority of all organizations and key personnel involved with the development of the Remedial Design;

(e)     Descriptions of any applicable permitting requirements and other regulatory requirements;

(f)     Description of plans for obtaining access in connection with the Work, such as property acquisition, property leases, and/or easements; and

(g)     A design criteria report, as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

(h)     60% drawings and specifications;

(i)     Descriptions of permit requirements, if applicable;

(j)     A description of how the Remedial Action will be implemented in a manner that minimizes environmental impacts in accordance with EPA's *Principles for Greener Cleanups* (Aug. 2009);

(k)     A description of monitoring and control measures to protect human health and the environment, such as air monitoring and dust suppression, during the Remedial Action;

(l)     Any proposed revisions to the Remedial Action Schedule that is set forth in ¶ 7.3 (Remedial Action Schedule); and

(m)     The following additional supporting deliverables described in ¶ 6.7 (Supporting Deliverables): Health and Safety Plan; Emergency Response Plan; Field Sampling Plan; Quality Assurance Project Plan; Site Wide Monitoring Plan; Construction Quality Assurance/Quality Control Plan; Transportation and Off-Site Disposal Plan; O+M Plan, if applicable; O+M Manual, if applicable; and Institutional Controls Implementation and Assurance Plan, if applicable.

3.6     **Pre-Final (95%) Remedial Design**.  Settling Defendant shall submit the Pre-final (95%) Remedial Design for EPA's comment.  The Pre-final Remedial Design must be a continuation and expansion of the previous design submittal and must address EPA's comments regarding the Intermediate Remedial Design.  The Pre-final Remedial Design will serve as the approved Final (100%) Remedial Design if EPA approves the Pre-final Remedial Design without comments.  The Pre-final Remedial Design must include:

5

(a)     A complete set of construction drawings and specifications that are: (1) certified by a registered professional engineer; (2) suitable for procurement; and (3) follow the Construction Specifications Institute's MasterFormat 2012;

(b)     A survey and engineering drawings showing existing Site features, such as elements, property borders, easements, and Site conditions;

(c)     Pre-Final versions of the same elements and deliverables as are required for the Intermediate Remedial Design;

(d)     A specification for photographic documentation of the Remedial Action; and

(e)     Updates of all supporting deliverables required to accompany the 60% Remedial Design.

**3.7     Final (100%) Remedial Design**.  Settling Defendant shall submit the Final (100%) Remedial Design for EPA approval.  The Final Remedial Design must address EPA's comments on the Pre-final Remedial Design and must include final versions of all Pre-final Remedial Design deliverables.

## 4.     REMEDIAL ACTION

**4.1     Remedial Action Work Plan**.  Settling Defendant shall submit a Remedial Action Work Plan (RAWP) for EPA and WDNR approval that includes:

(a)     A proposed Remedial Action Construction Schedule in Gantt chart format;

(b)     An updated health and safety plan that covers activities during the Remedial Action; and

(c)     Plans for satisfying permitting requirements, including obtaining permits for off-site activity and for satisfying substantive requirements of permits for on-site activity.

**4.2     Meetings and Inspections**

(a)     **Preconstruction Conference**.  Settling Defendant shall hold a preconstruction conference with EPA and WDNR and others as directed or approved by EPA and as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995).  Settling Defendant shall prepare minutes of the conference and shall distribute the minutes to all Parties.

(b)     **Periodic Meetings**.  During the construction portion of the Remedial Action (Remedial Action Construction), Settling Defendant shall meet regularly with EPA and WDNR, and others as directed or determined by EPA to discuss

construction issues.  Settling Defendant shall distribute an agenda and list of attendees to all Parties prior to each meeting.  Settling Defendant shall prepare minutes of the meetings and shall distribute the minutes to all Parties.

(c)   **Inspections**

   (1)   EPA or WDNR or their representatives shall conduct periodic inspections of or have an on-site presence during the Work. At EPA's or WDNR's request, the Supervising Contractor or other designee shall accompany EPA or WDNR or their representatives during inspections.

   (2)   Upon notification by EPA, after consultation with WDNR, of any deficiencies in the Remedial Action Construction, Settling Defendant shall take all necessary steps to correct the deficiencies and/or bring the Remedial Action Construction into compliance with the approved Final Remedial Design, any approved design changes, and/or the approved RAWP.  If applicable, Settling Defendant shall comply with any schedule provided by EPA, after consultation with WDNR, in its notice of deficiency.

**4.3**   **Emergency Response and Reporting**

(a)   **Emergency Response and Reporting**.  If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from the Site and that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Settling Defendant shall: (1) immediately take all appropriate action to prevent, abate, or minimize such release or threat of release; (2) immediately notify the authorized EPA and WDNR officers (as specified in ¶ 4.3(c)) orally; and (3) take such actions in consultation with the authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plan, the Emergency Response Plan, and any other deliverable approved by EPA under the SOW.

(b)   **Release Reporting**.  Upon the occurrence of any event during performance of the Work that Settling Defendant is required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004, Settling Defendant shall immediately notify the authorized EPA and WDNR officers orally.

(c)   The "authorized EPA and WDNR officers" for purposes of immediate oral notifications and consultations under ¶ 4.3(a) and ¶ 4.3(b) is the EPA Project Coordinator, the EPA Alternate Project Coordinator (if the EPA Project Coordinator is unavailable), or the EPA Emergency Response Unit, Region 5 (if

7

neither EPA Project Coordinator is available), and the WDNR Project Coordinator.

(d)     For any event covered by ¶ 4.3(a) and ¶ 4.3(b), Settling Defendant shall: (1) within [14] days after the onset of such event, submit a report to EPA and WDNR describing the actions or events that occurred and the measures taken, and to be taken, in response thereto; and (2) within 30 days after the conclusion of such event, submit a report to EPA and WDNR describing all actions taken in response to such event.

(e)     The reporting requirements under ¶ 4.3 are in addition to the reporting required by CERCLA § 103 or EPCRA § 304.

## 4.4     Off-Site Shipments

(a)     Settling Defendant may ship hazardous substances, pollutants, and contaminants from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440.  Settling Defendant will be deemed to be in compliance with CERCLA § 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Settling Defendant obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

(b)     Settling Defendant may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, it provides notice to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator.  This notice requirement will not apply to any off-Site shipments when the total quantity of all such shipments does not exceed 10 cubic yards.  The notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation.  Settling Defendant also shall notify the state environmental official referenced above and the EPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility.  Settling Defendant shall provide the notice after the award of the contract for Remedial Action construction and before the Waste Material is shipped.

(c)     Settling Defendant may ship Investigation Derived Waste (IDW) from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, *EPA's Guide to Management of Investigation Derived Waste*, OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the ROD.  Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the

8

requirements for an exemption from RCRA under 40 CFR § 261.4(e) shipped off-site for treatability studies, are not subject to 40 C.F.R. § 300.440.

**4.5    Certification of Remedial Action Completion**

(a)    **Remedial Action Completion Inspection**.  The Remedial Action is "Complete" for purposes of this ¶ 4.5 when it has been fully performed and the Performance Standards have been achieved.  Settling Defendant shall schedule an inspection for the purpose of obtaining EPA's Certification of Remedial Action Completion. The inspection must be attended by Settling Defendant and EPA and WDNR and/or their representatives.

(b)    **Remedial Action Report**.  Following the inspection, Settling Defendant shall submit a Remedial Action Report to EPA requesting EPA's Certification of Remedial Action Completion.  The report must: (1) include certifications by a registered professional engineer and by Settling Defendant's Project Coordinator that the Remedial Action is complete; (2) include as-built drawings signed and stamped by a registered professional engineer; (3) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011); (4) contain monitoring data to demonstrate that Performance Standards have been achieved; and (5) be certified in accordance with ¶ 6.5 (Certification).

(c)    If EPA, after consultation with WDNR, concludes that the Remedial Action is not Complete, EPA shall so notify Settling Defendant.  EPA's notice must include a description of any deficiencies.  EPA's notice may include a schedule for addressing such deficiencies or may require Settling Defendant to submit a schedule for EPA approval.  Settling Defendant shall perform all activities described in the notice in accordance with the schedule.

(d)    If EPA concludes based on the initial or any subsequent Remedial Action Report requesting Certification of Remedial Action Completion, that the Remedial Action is Complete, EPA shall so certify to Settling Defendant.  This certification will constitute the Certification of Remedial Action Completion for purposes of the CD, including Section [**XVI**] of the CD (Covenants by Plaintiff[s]). Certification of Remedial Action Completion will not affect Settling Defendant's remaining obligations under the CD.

**4.6    Periodic Review Support Plan (PRSP)**.  If a PRSP is necessary, Settling Defendant shall submit the PRSP for EPA approval.  If needed, the PRSP will address the studies and investigations that Settling Defendant will conduct to support EPA's reviews of whether the Remedial Action is protective of human health and the environment in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c) (also known as "Five-year Reviews").  Settling Defendant will develop the plan in accordance with

9

*Comprehensive Five-year Review Guidance*, OSWER 9355.7-03B-P (June 2001), and any other relevant five-year review guidances.

**4.7    Certification of Work Completion**

(a)    **Work Completion Inspection**.  Settling Defendant shall schedule an inspection for the purpose of obtaining EPA's Certification of Work Completion.  The inspection must be attended by Settling Defendant and EPA and WDNR and/or their representatives.

(b)    **Work Completion Report**.  Following the inspection, Settling Defendant shall submit a report to EPA and WDNR requesting EPA's and WDNR's Certification of Work Completion.  The report must: (1) include certifications by a registered professional engineer and by Settling Defendant's Project Coordinator that the Work, including all O&M activities, is complete; and (2) be certified in accordance with ¶ 6.5 (Certification).  If the Remedial Action Report submitted under ¶ 4.5(b) includes all elements required under this ¶ 4.7(b), then the Remedial Action Report suffices to satisfy all requirements under this ¶ 4.7(b).

(c)    If EPA, after consultation with WDNR, concludes that the Work is not complete, EPA shall so notify Settling Defendant.  EPA's notice must include a description of the activities that Settling Defendant must perform to complete the Work.  EPA's notice must include specifications and a schedule for such activities or must require Settling Defendant to submit specifications and a schedule for EPA approval.  Settling Defendant shall perform all activities described in the notice or in the EPA-approved specifications and schedule.

(d)    If EPA and WDNR, conclude based on the initial or any subsequent report requesting Certification of Work Completion, that the Work is complete, EPA and WDNR shall so certify in writing to Settling Defendant.  Issuance of the Certification of Work Completion does not affect the following continuing obligations: (1) activities under the Periodic Review Support Plan; (2) obligations under Sections [**VIII**] (Property Requirements), [**XX**] (Retention of Records), and [**XIX**] (Access to Information) of the CD; (3) Institutional Controls obligations as provided in the ICIAP; (4) ongoing O&M activities; (5) obligations under any state permits, including any permit equivalency issued under Section 30.20(2) of the Wisconsin Statutes; and (6) reimbursement of EPA's Future Response Costs under Section [**X**] (Payments for Response Costs) of the CD.

## 5.    REPORTING

**5.1    Progress Reports**.  Commencing with the first month following lodging of the CD and until EPA approves the Remedial Action Completion Report, Settling Defendant shall submit progress reports to EPA and WDNR on a monthly basis, or as otherwise requested

by EPA.  The reports must cover all activities that took place during the prior reporting period, including:

(a)     The actions that have been taken toward achieving compliance with the CD;

(b)     A summary of all results of sampling, tests, and all other data received or generated by Settling Defendant;

(c)     A description of all deliverables that Settling Defendant submitted to EPA;

(d)     A description of all activities relating to Remedial Action Construction that are scheduled for the next six weeks;

(e)     An updated Remedial Action Construction Schedule, together with information regarding percentage of completion, delays encountered or anticipated that may affect the future schedule for implementation of the Work, and a description of efforts made to mitigate those delays or anticipated delays;

(f)     A description of any modifications to the work plans or other schedules that Settling Defendant has proposed or that have been approved by EPA; and

(g)     A description of all activities undertaken in support of the Community Involvement Plan (CIP) during the reporting period and those to be undertaken in the next six weeks.

**5.2**   **Notice of Progress Report Schedule Changes**.  If the schedule for any activity described in the Progress Reports, including activities required to be described under ¶ 5.1(d), changes, Settling Defendant shall notify EPA and WDNR of such change at least 7 days before performance of the activity.

## 6.     DELIVERABLES

**6.1**   **Applicability**.  Settling Defendant shall submit deliverables for EPA approval or for EPA comment as specified in the SOW.  If neither is specified, the deliverable does not require EPA's approval or comment.  Paragraphs 6.2 (In Writing) through 6.4 (Technical Specifications) apply to all deliverables.  Paragraph 6.5 (Certification) applies to any deliverable that is required to be certified.  Paragraph 6.6 (Approval of Deliverables) applies to any deliverable that is required to be submitted for EPA approval.

**6.2**   **In Writing**.  As provided in [¶ **105**] of the CD, all deliverables under this SOW must be in writing unless otherwise specified.

**6.3**   **General Requirements for Deliverables.**  All deliverables must be submitted by the deadlines in the Remedial Design Schedule or RA Schedule, as applicable.  Settling Defendant shall submit all deliverables to EPA and WDNR in electronic form.  Technical

11

specifications for sampling and monitoring data and spatial data are addressed in ¶ 7.4. All other deliverables shall be submitted to EPA and WDNR in the electronic form specified by the EPA Project Coordinator. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5" by 11", Settling Defendant shall also provide EPA and WDNR with paper copies of such exhibits.

**6.4    Technical Specifications**

(a)    Sampling and monitoring data should be submitted in standard regional Electronic Data Deliverable (EDD) format. Other delivery methods may be allowed if electronic direct submission presents a significant burden or as technology changes.

(b)    Spatial data, including spatially-referenced data and geospatial data, should be submitted: (1) in the ESRI File Geodatabase format; and (2) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://edg.epa.gov/EME/.

(c)    Each file must include an attribute name for each site unit or sub-unit submitted. Consult http://www.epa.gov/geospatial/policies.html for any further available guidance on attribute identification and naming.

(d)    Spatial data submitted by Settling Defendant does not, and is not intended to, define the boundaries of the Site.

**6.5    Certification**.  All deliverables that require compliance with this ¶ 6.5 must be signed by the Settling Defendant's Project Coordinator, or other responsible official of Settling Defendant, and must contain the following statement:

*I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true,*

12

*accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.*

**6.6    Approval of Deliverables**

(a)    **Initial Submissions**

(1)    After review of any deliverable that is required to be submitted for EPA approval under the CD or the SOW, EPA shall: (i) approve, in whole or in part, the submission; (ii) approve the submission upon specified conditions; (iii) disapprove, in whole or in part, the submission; or (iv) any combination of the foregoing.

(2)    EPA also may modify the initial submission to cure deficiencies in the submission if: (i) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (ii) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

(b)    **Resubmissions**.  Upon receipt of a notice of disapproval under ¶ 6.6(a) (Initial Submissions), or if required by a notice of approval upon specified conditions under ¶ 6.6(a), Settling Defendant shall, within 21 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the deliverable for approval.  After review of the resubmitted deliverable, EPA, after a reasonable opportunity for review and comment by WDNR, may: (1) approve, in whole or in part, the resubmission; (2) approve the resubmission upon specified conditions; (3) modify the resubmission; (4) disapprove, in whole or in part, the resubmission, requiring Settling Defendant to correct the deficiencies; or (5) any combination of the foregoing.

(c)    **Implementation**.  Upon approval, approval upon conditions, or modification by EPA under ¶ 6.6(a) (Initial Submissions) or ¶ 6.6(b) (Resubmissions), of any deliverable, or any portion thereof: (1) such deliverable, or portion thereof, will be incorporated into and enforceable under the CD; and (2) Settling Defendant shall take any action required by such deliverable, or portion thereof.  The implementation of any non-deficient portion of a deliverable submitted or resubmitted under ¶ 6.6(a) or ¶ 6.6(b) does not relieve Settling Defendant of any liability for stipulated penalties under Section [**XV**] (Stipulated Penalties) of the CD.

(d)    **Technical Impracticability**.  Settling Defendant may petition EPA to waive compliance with one or more of the Phase 2 Performance Standards based on a

13

demonstration that it is technically impracticable, from an engineering perspective, to attain those standards.

(1)    The determination of whether attainment of a particular Performance Standard is technically impracticable will be made by EPA, after consultation with WDNR, and will be based on the engineering feasibility and reliability of the remedy.  If Settling Defendant objects to EPA's decision it may, within 30 days after EPA's notification, seek dispute resolution under Section XIV of the Phase 2 Consent Decree (Record Review).

(2)    Neither the submission of a petition by Settling Defendant nor the granting of a waiver of one or more Performance Standards by EPA pursuant to this Section shall relieve Settling Defendant of its obligation to (i) continue to operate the Phase 2 remedy until the time specified by EPA, (ii) attain Performance Standards for any contaminants for which EPA has not specifically granted a waiver, and (iii) complete any other obligation under this Consent Decree.

(3)    Such a petition shall include, at a minimum, the information and analyses required by EPA guidance and the site-specific information described in Subparagraphs (i) through (xii), as follows:

    (i)    A list of each Performance Standard for which a waiver is sought, and the spatial limits for which they are sought.  The justification for a waiver required by items (i) - (xii) below must be made for each contaminant or class of contaminants for which a waiver is sought.

    (ii)    A description of known or suspected contaminant sources at the site, including dense non-aqueous phase liquid ("DNAPL") contaminants.  The petition also shall describe source control and removal efforts that have been implemented and the effectiveness of those efforts.

    (iii)    Comprehensive monitoring data and an evaluation of the remedy implemented, along with any other remediation actions performed which enhanced or affected this remedy.  The monitoring data and performance evaluation shall demonstrate, using an appropriate engineering and statistical analysis, that the remedy has been operating for a sufficiently long period of time to permit a reliable analysis of its performance and its ability to achieve Performance Standards.  The petition also shall demonstrate that the remedy has been designed, constructed, and operated in a manner which is

consistent with the RD/RA Work Plan and the conceptual models for site contamination, and that the system has been modified or enhanced to the extent practicable to optimize its performance in an effort to attain the Performance Standards.

(iv)    A description of the conceptual model for site contamination, including geologic, hydrogeologic, and geochemical characterizations. A description of the distribution; characteristics; migration, potential migration and fate; and quantities of contaminants present at the site. These descriptions shall incorporate pertinent data obtained during the design, construction, and operation of the remedial system, as well as information obtained during previous site characterization efforts.

(v)    An analysis of the performance of the remedy which describes the spatial and temporal trends in contaminant concentrations; for example, whether contaminant migration has been effectively prevented, and whether the concentrations of contaminants have been slowly decreasing. The petition shall discuss the hydrogeochemical factors which influence the remedy's ability to achieve the Performance Standards, and demonstrate how these factors inhibit the remedial system achieving the Performance Standards.

(vi)    The mass of contaminants removed by the remedial system, and an estimate of the mass of contaminants remaining, including the degree of uncertainty involved in this estimate.

(vii)    A demonstration, including appropriate engineering analysis, that other conventional or innovative technologies which are potentially applicable at the site cannot attain the Performance Standards in a manner that is practicable from an engineering perspective. This demonstration should include a prediction of the level of cleanup other technologies can attain.

(viii)    A predictive analysis of the approximate time frame required to achieve the Performance Standards with the existing remedy, and any alternative remedial strategies, if applicable, using methods appropriate for the data and the site-specific conditions. Such analyses also should address the uncertainty inherent in these predictions.

(ix)    For the implemented remedy and for any alternative remedial strategies proposed as part of this petition, identification of the

15

potential pathways by which humans and the environment are or may become exposed to the contaminated ground water left in place. Contaminant concentration and other data needed for EPA to perform risk analyses shall be provided as part of the petition.

(x)     A description of the proposed alternative remedial strategy, or a comparison of two or more strategy options, proposed to be implemented by the Settling Defendant if a waiver is granted, and the level of cleanup and control of hazardous substances, pollutants, and contaminants the proposed alternative strategy or strategies will attain. Alternative remedial strategies must attain a level of cleanup and control of further releases which ensure protection of human health and the environment, and prevent further migration of contaminants. Alternative remedial strategies may include the establishment of alternative Performance Standards, site-specific cleanup levels, and other alternative remediation requirements to ensure protectiveness. Proposed modifications to the existing remedy, and any additional response actions proposed to be undertaken, shall be described by the Settling Defendant in detail. EPA will make the final determination regarding the components of the alternative remedial strategy which shall be implemented at the site by the Settling Defendant.

(xi)    A description of any additional monitoring required to verify compliance with the alternative Performance Standards or remedial requirements. EPA will make the final determination regarding the scope of the monitoring requirements under the alternative remedial strategy.

(xii)   Other information or analyses not included above, but which Settling Defendant or EPA considers appropriate to making a determination on the petition.

(4)     Upon receipt of all information required by subparagraph (d)(3), EPA will review and consider the information in the petition and any other relevant information. After opportunity for review and comment by WDNR, EPA will determine (1) whether compliance with any of the Performance Standards shall be waived; (2) what, if any, alternative remediation requirements, including alternative Performance Standards and other protective measures, will be established by EPA; (3) whether modifications to the remedial action or any additional response actions are required; and (4) whether revised interim milestone and completion dates are needed for attainment of Performance Standards or alternative

16

Performance Standards under this consent decree. EPA's determination on the petition will be consistent with the National Contingency Plan ("NCP"), Section 121(d) of CERCLA, and any other applicable laws, regulations, and guidance in effect at the time.

(5)     If EPA, after a reasonable opportunity for review and comment by WDNR, grants any petition or other relief pursuant to this Section, that decision will be reflected in a post-ROD decision document, as required by the NCP. If modification of the Phase 2 Consent Decree or this SOW is required to implement EPA's decision, such modification will be filed and, if necessary, Court approval will be sought in accordance with Section XXIV of the Phase 2 Consent Decree (Modification).

(6)     Upon issuance of EPA's post-ROD decision document, filing of the revised SOW and Consent Decree with the Court, and if necessary, issuance of a court order approving the modification, Settling Defendant shall implement the modifications selected by EPA to the remedial action or additional response actions relating to ground water contamination, and achieve and maintain all Performance Standards, alternative Performance Standards, and remediation requirements established pursuant to this Section. Unless expressly modified by EPA's decision on the petition submitted hereunder, all requirements of this Consent Decree, including Settling Defendant's obligation to achieve the alternative Performance Standards and to conduct long-term monitoring, shall continue in force and effect.

**6.7    Supporting Deliverables**. Settling Defendant shall submit each of the following supporting deliverables for EPA approval, except as specifically provided. Settling Defendant shall develop the deliverables in accordance with all applicable regulations, guidances, and policies (see Section 9 (References)). Settling Defendant shall update each of these supporting deliverables as necessary or appropriate during the course of the Work, and/or as requested by EPA.

(a)     **Health and Safety Plan**. The Health and Safety Plan (HASP) describes all activities to be performed to protect on site personnel and area residents from physical, chemical, and all other hazards posed by the Work. Settling Defendant shall develop the HASP in accordance with EPA's Emergency Responder Health and Safety and Occupational Safety and Health Administration (OSHA) requirements under 29 C.F.R. §§ 1910 and 1926. The HASP should cover Remedial Design activities and should be, as appropriate, updated to cover activities during the Remedial Action and updated to cover activities after Remedial Action completion. EPA does not approve the HASP, but will review it to ensure that all necessary elements are included and that the plan provides for the protection of human health and the environment.

17

(b) **Emergency Response Plan**.  The Emergency Response Plan (ERP) must describe procedures to be used in the event of an accident or emergency at the Site (for example, power outages, water impoundment failure, treatment plant failure, slope failure, etc.).  The ERP must include:

    (1)    Name of the person or entity responsible for responding in the event of an emergency incident;

    (2)    Plan and date(s) for meeting(s) with the local community, including local, State, and federal agencies involved in the cleanup, as well as local emergency squads and hospitals;

    (3)    Spill Prevention, Control, and Countermeasures (SPCC) Plan (if applicable), consistent with the regulations under 40 C.F.R. Part 112, describing measures to prevent, and contingency plans for, spills and discharges;

    (4)    Notification activities in accordance with ¶ 4.3(b) (Release Reporting) in the event of a release of hazardous substances requiring reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004; and

    (5)    A description of all necessary actions to ensure compliance with Paragraph [**11**] (Emergencies and Releases) of the CD in the event of an occurrence during the performance of the Work that causes or threatens a release of Waste Material from the Site that constitutes an emergency or may present an immediate threat to public health or welfare or the environment.

(c) **Field Sampling Plan**.  The Field Sampling Plan (FSP) addresses all sample collection activities.  The FSP must be written so that a field sampling team unfamiliar with the project would be able to gather the samples and field information required.  Settling Defendant shall develop the FSP in accordance with *Guidance for Conducting Remedial Investigations and Feasibility Studies*, EPA/540/G 89/004 (Oct. 1988).

(d) **Quality Assurance Project Plan**.  The Quality Assurance Project Plan (QAPP) augments the FSP and addresses sample analysis and data handling regarding the Work.  The QAPP must include a detailed explanation of Settling Defendant's quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance, and monitoring samples.  Settling Defendant shall develop the QAPP in accordance with *EPA Requirements for Quality Assurance Project Plans*, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May

18

2006); *Guidance for Quality Assurance Project Plans*, QA/G-5, EPA/240/R 02/009 (Dec. 2002); and *Uniform Federal Policy for Quality Assurance Project Plans*, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005). The QAPP also must include procedures:

(1)     To ensure that EPA and the State and their authorized representative have reasonable access to laboratories used by Settling Defendant in implementing the CD (Settling Defendant's Labs);

(2)     To ensure that Settling Defendant's Labs analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring;

(3)     To ensure that Settling Defendant's Labs perform all analyses using EPA-accepted methods (i.e., the methods documented in *USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis*, ILM05.4 (Dec. 2006); *USEPA Contract Laboratory Program Statement of Work for Organic Analysis*, SOM01.2 (amended Apr. 2007); and *USEPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration)*, ISM01.2 (Jan. 2010)); or other methods acceptable to EPA;

(4)     To ensure that Settling Defendant's Labs participate in an EPA-accepted QA/QC program or other program QA/QC acceptable to EPA;

(5)     For Settling Defendant to provide EPA and the State with notice at least 28 days prior to any sample collection activity;

(6)     For Settling Defendant to provide split samples and/or duplicate samples to EPA and the State upon request;

(7)     For EPA and the State to take any additional samples that they deem necessary;

(8)     For EPA and the State to provide to Settling Defendant, upon request, split samples and/or duplicate samples in connection with EPA's and the State's oversight sampling; and

(9)     For Settling Defendant to submit to EPA and the State all sampling and tests results and other data in connection with the implementation of the CD.

(e)     **Site Wide Monitoring Plan**.  The purpose of the Site Wide Monitoring Plan (SWMP) is to obtain baseline information regarding the extent of contamination in affected media at the Site; to obtain information, through short- and long- term monitoring, about the movement of and changes in contamination throughout the

Site, before and during implementation of the Remedial Action; to obtain information regarding contamination levels to determine whether Performance Standards are achieved; and to obtain information to determine whether to perform additional actions, including further Site monitoring. The SWMP must include:

(1)     Description of the environmental media to be monitored;

(2)     Description of the data collection parameters, including existing and proposed monitoring devices and locations, schedule and frequency of monitoring, analytical parameters to be monitored, and analytical methods employed;

(3)     Description of how performance data will be analyzed, interpreted, and reported, and/or other Site-related requirements;

(4)     Description of verification sampling procedures;

(5)     Description of deliverables that will be generated in connection with monitoring, including sampling schedules, laboratory records, monitoring reports, and monthly and annual reports to EPA and State agencies; and

(6)     Description of proposed additional monitoring and data collection actions (such as increases in frequency of monitoring, and/or installation of additional monitoring devices in the affected areas) in the event that results from monitoring devices indicate changed conditions (such as higher than expected concentrations of the contaminants of concern or groundwater contaminant plume movement).

(f)     **Construction Quality Assurance/Quality Control Plan (CQA/QCP)**. The purpose of the Construction Quality Assurance Plan (CQAP) is to describe planned and systemic activities that provide confidence that the Remedial Action construction will satisfy all plans, specifications, and related requirements, including quality objectives. The purpose of the Construction Quality Control Plan (CQCP) is to describe the activities to verify that Remedial Action construction has satisfied all plans, specifications, and related requirements, including quality objectives. The CQA/QCP must:

(1)     Identify, and describe the responsibilities of, the organizations and personnel implementing the CQA/QCP;

(2)     Describe the Performance Standards required to be met to achieve Completion of the Remedial Action;

20

(3)     Describe the activities to be performed: (i) to provide confidence that Performance Standards will be met; and (ii) to determine whether Performance Standards have been met;

(4)     Describe verification activities, such as inspections, sampling, testing, monitoring, and production controls, under the CQA/QCP;

(5)     Describe industry standards and technical specifications used in implementing the CQA/QCP;

(6)     Describe procedures for tracking construction deficiencies from identification through corrective action;

(7)     Describe procedures for documenting all CQA/QCP activities; and

(8)     Describe procedures for retention of documents and for final storage of documents.

(g)     **O&M Plan**. If EPA, determines that O&M is required, the O&M Plan will describe the requirements for inspecting, operating, and maintaining the Remedial Action.  Settling Defendant shall develop the O&M Plan in accordance with *Operation and Maintenance in the Superfund Program*, OSWER 9200.1 37FS, EPA/540/F-01/004 (May 2001).  The O&M Plan will include the following additional requirements:

(1)     Description of Performance Standards required to be met to implement the ROD;

(2)     Description of activities to be performed: (i) to provide confidence that Performance Standards will be met; and (ii) to determine whether Performance Standards have been met;

(3)     **O&M Reporting**.  Description of records and reports that will be generated during O&M, such as daily operating logs, laboratory records, records of operating costs, reports regarding emergencies, personnel and maintenance records, monitoring reports, and monthly and annual reports to EPA and State agencies;

(4)     Description of corrective action in case of systems failure, including: (i) alternative procedures to prevent the release or threatened release of Waste Material which may endanger public health and the environment or may cause a failure to achieve Performance Standards; (ii) analysis of vulnerability and additional resource requirements should a failure occur; (iii) notification and reporting requirements should O&M systems fail or

21

be in danger of imminent failure; and (iv) community notification requirements; and

(5)     Description of corrective action to be implemented in the event that Performance Standards are not achieved; and a schedule for implementing these corrective actions.

(h)     **O&M Manual**.  If EPA, determines that O&M is required, the O&M Manual will serve as a guide to the purpose and function of the equipment and systems that make up the remedy.  Settling Defendant will develop the O&M Manual in accordance with *Operation and Maintenance in the Superfund Program*, OSWER 9200.1 37FS, EPA/540/F-01/004 (May 2001).

(i)     **Institutional Controls Implementation and Assurance Plan**.  If applicable, the Institutional Controls Implementation and Assurance Plan (ICIAP) will describe plans to implement, maintain, and enforce the Institutional Controls (ICs) at the Site.  Settling Defendant shall develop the ICIAP in accordance with *Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites*, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012), and *Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites*, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012).

## 7.     SCHEDULES

**7.1**     **Applicability and Revisions**.  All deliverables and tasks required under this SOW must be submitted or completed by the deadlines or within the time durations listed in the Remedial Design and Remedial Action Schedules set forth below.  Settling Defendant may submit proposed revised Remedial Design Schedules or Remedial Action Schedules for EPA approval.  Upon EPA's approval, the revised Remedial Design and/or Remedial Action Schedules supersede the Remedial Design and Remedial Action Schedules set forth below, and any previously-approved Remedial Design and/or Remedial Action Schedules.  Settling Defendant may accelerate the dates in the Remedial Design Schedules and Remedial Action Schedules at its option consistent with the goals identified in this SOW.

**7.2     Remedial Design Schedule**

| | Description of Deliverable, Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | Pre-Design Investigation Work Plan | 3.1 | The PDI Work Plan was submitted on July 8, 2016, and approved by EPA, in consultation with WDNR, on July 18, 2016.  The Supplemental PDI Work Plan was submitted on November 21, 2016, and approved by EPA in consultation with WDNR, on November 23, 2016. |
| 2 | Remedial Design Work Plan | 3.2 | The Remedial Design Work Plan was submitted on September 29, 2016, and approved by EPA, in consultation with WDNR, on December 19, 2016. |
| 3 | Intermediate (60%) Remedial Design | 3.5 | The 60% Design was submitted on September 30, 2016. |
| 4 | Pre-final (95%) Remedial Design | 3.6 | By December 22, 2016, or within 60 days after EPA comments on Intermediate (60%) Remedial Design if comments not received by October 21, 2016. |
| 5 | Final (100%) Remedial Design | 3.7 | By January 31, 2017, or within 20 days after EPA comments on Pre-final Remedial Design if comments not received by January 13, 2017. |

**7.3     Remedial Action Schedule**

| | Description of Deliverable / Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | RAWP | 4.1 | Within 30 days after EPA approval of the 100% Remedial Design. |
| 2 | Pre-Construction Conference | 4.2(a) | Prior to the start of Construction |
| 3 | Start of Construction | | Within 30 days after Pre-Construction Conference |
| 4 | Draft ICIAP Plan (if applicable | 6.7(i) | Within 90 days after completion of dredging |
| 5 | Final ICIAP Plan (if applicable) | 6.7(i) | No later than Pre-final Inspection |
| 6 | Final Inspection | 4.5(a) | 15 days after Completion of Work identified in Pre-final Inspection Report |
| 7 | Remedial Action Report | 4.5(b) | 30 days after Final Inspection |
| 8 | Work Completion Report | 4.7(b) | |
| 9 | Periodic Review Support Plan | 4.6 | Five years after Start of Remedial Action Construction |

23

# 8.    STATE PARTICIPATION

8.1    **Copies**.  Settling Defendant shall, at any time they send a deliverable to EPA, send a copy of such deliverable to the WDNR.  EPA shall, at any time it sends a notice, authorization, approval, disapproval, or certification to Settling Defendant, send a copy of such document to the State.

8.2    **Review and Comment**.  WDNR will have a reasonable opportunity for review and comment prior to:

(a)    Any EPA approval or disapproval under ¶ 6.6 (Approval of Deliverables) of any deliverables that are required to be submitted for EPA approval; and

(b)    Any disapproval of, or Certification of Remedial Action Completion under ¶ 4.5 (Certification of Remedial Action Completion), and any disapproval of, or Certification of Work Completion under ¶ 4.7 (Certification of Work Completion).

8.3    **Review and Approve.**  WDNR shall have the right to review and approve the Remedial Action Work Plans and the Certification of Work Completion.

# 9.    REFERENCES

9.1    The following regulations and guidance documents, among others, apply to the Work. Any item for which a specific URL is not provided below is available on one of the two EPA Web pages listed in ¶ 9.2:

(a)    A Compendium of Superfund Field Operations Methods, OSWER 9355.0-14, EPA/540/P-87/001a (Aug. 1987).

(b)    CERCLA Compliance with Other Laws Manual, Part I: Interim Final, OSWER 9234.1-01, EPA/540/G-89/006 (Aug. 1988).

(c)    Guidance for Conducting Remedial Investigations and Feasibility Studies, OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988).

(d)    CERCLA Compliance with Other Laws Manual, Part II, OSWER 9234.1-02, EPA/540/G-89/009 (Aug. 1989).

(e)    Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER 9355.5-01, EPA/540/G-90/001 (Apr.1990).

(f)    Guidance on Expediting Remedial Design and Remedial Actions, OSWER 9355.5-02, EPA/540/G-90/006 (Aug. 1990).

(g)     Guide to Management of Investigation-Derived Wastes, OSWER 9345.3-03FS (Jan. 1992).

(h)     Permits and Permit Equivalency Processes for CERCLA On-Site Response Actions, OSWER 9355.7-03 (Feb. 1992).

(i)     Guidance for Conducting Treatability Studies under CERCLA, OSWER 9380.3-10, EPA/540/R-92/071A (Nov. 1992).

(j)     National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 40 C.F.R. Part 300 (Oct. 1994).

(k)     Guidance for Scoping the Remedial Design, OSWER 9355.0-43, EPA/540/R-95/025 (Mar. 1995).

(l)     Remedial Design/Remedial Action Handbook, OSWER 9355.0-04B, EPA/540/R-95/059 (June 1995).

(m)    EPA Guidance for Data Quality Assessment, Practical Methods for Data Analysis, QA/G-9, EPA/600/R-96/084 (July 2000).

(n)     Operation and Maintenance in the Superfund Program, OSWER 9200.1-37FS, EPA/540/F-01/004 (May 2001).

(o)     Comprehensive Five-year Review Guidance, OSWER 9355.7-03B-P, 540-R-01-007 (June 2001).

(p)     Guidance for Quality Assurance Project Plans, QA/G-5, EPA/240/R-02/009 (Dec. 2002).

(q)     Institutional Controls: Third Party Beneficiary Rights in Proprietary Controls (Apr. 2004).

(r)     Quality management systems for environmental information and technology programs -- Requirements with guidance for use, ASQ/ANSI E4:2014 (American Society for Quality, February 2014).

(s)     Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005).

(t)     Superfund Community Involvement Handbook, EPA/540/K-05/003 (Apr. 2005).

(u)     EPA Guidance on Systematic Planning Using the Data Quality Objectives Process, QA/G-4, EPA/240/B-06/001 (Feb. 2006).

(v)     EPA Requirements for Quality Assurance Project Plans, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006).

(w)     EPA Requirements for Quality Management Plans, QA/R-2, EPA/240/B-01/002 (Mar. 2001, reissued May 2006).

(x)     USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis, ILM05.4 (Dec. 2006).

(y)     USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2 (amended Apr. 2007).

(z)     EPA National Geospatial Data Policy, CIO Policy Transmittal 05-002 (Aug. 2008), available at http://www.epa.gov/geospatial/policies.html and http://www.epa.gov/geospatial/docs/National_Geospatial_Data_Policy.pdf.

(aa)    Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration, OSWER 9283.1-33 (June 2009).

(bb)    Principles for Greener Cleanups (Aug. 2009), available at http://www.epa.gov/oswer/greenercleanups/.

(cc)    USEPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration), ISM1.2 (Jan. 2010).

(dd)    Close Out Procedures for National Priorities List Sites, OSWER 9320.2-22 (May 2011).

(ee)    Groundwater Road Map: Recommended Process for Restoring Contaminated Groundwater at Superfund Sites, OSWER 9283.1-34 (July 2011).

(ff)    Recommended Evaluation of Institutional Controls: Supplement to the "Comprehensive Five-Year Review Guidance," OSWER 9355.7-18 (Sep. 2011).

(gg)    Construction Specifications Institute's MasterFormat 2012, available from the Construction Specifications Institute, www.csinet.org/masterformat.

(hh)    Updated Superfund Response and Settlement Approach for Sites Using the Superfund Alternative Approach, OSWER 9200.2-125 (Sep. 2012)

(ii)    Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012).

26

(jj)   Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012).

(kk)   EPA's Emergency Responder Health and Safety Manual, OSWER 9285.3-12 (July 2005 and updates), http://www.epaosc.org/_HealthSafetyManual/manual-index.htm.

(ll)   Broader Application of Remedial Design and Remedial Action Pilot Project Lessons Learned, OSWER 9200.2-129 (Feb. 2013).

(mm)   Guidance for Evaluating Completion of Groundwater Restoration Remedial Actions, OSWER 9355.0-129 (Nov. 2013).

(nn)   Groundwater Remedy Completion Strategy: Moving Forward with the End in Mind, OSWER 9200.2-144 (May 2014).

**9.2**   A more complete list may be found on the following EPA Web pages:

Laws, Policy, and Guidance   http://www.epa.gov/superfund/policy/index.htm

Test Methods Collections       http://www.epa.gov/fem/methcollectns.htm

**9.3**   For any regulation or guidance referenced in the CD or SOW, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after Settling Defendant receive notification from EPA of the modification, amendment, or replacement.

# APPENDIX C

# INDEX TO APPENDIX C

| EXHIBIT 1 | Excerpt from Cooperation and Access Agreement Northern States Power Company and The City of Ashland October 30, 2012 <ul><li>**TAB A** - Exhibit A Site Location Map Phase I Pre-Design Study Work Plan Ashland/NSP Lakefront Site</li><li>**TAB B** - Exhibit B Map of Property Owned by City of Ashland</li><li>**TAB C** - Excerpts of Consent Decree Between the United States, Wisconsin, Northern States Power Company, and the Bad River and Red Cliff Bands of The Lake Superior Tribe of Chippewa Indians</li><li>**TAB D** - Excerpts of Phase I Remedial Design Work Plan Ashland/NSP Lakefront Site</li></ul> |
|---|---|
| EXHIBIT 2 | Excerpt from First Amendment of Cooperation and Access Agreement, Northern States Power Company and The City of Ashland, April 7, 2014 <ul><li>**Exhibit E** - Excerpts from Wet Dredge Pilot Study Work Plan Ashland Lakefront Superfund Site</li></ul> |
| EXHIBIT 3 | Excerpt from Second Amendment of Cooperation and Access Agreement, Northern States Power Company and The City of Ashland, May 21, 2015 <ul><li>**EXHIBIT F -** Excerpt from Pre-Final Design for Ashland Breakwater, April 2015</li></ul> |
| EXHIBIT 4 | Excerpt from Cooperation and Settlement Agreement Northern States Power Company and The City of Ashland, April 27, 2016 |

# EXHIBIT 1

Excerpt from Cooperation and Access Agreement
Northern States Power Company and The City of Ashland
October 30, 2012

## COOPERATION AND ACCESS AGREEMENT

THIS COOPERATION AND ACCESS AGREEMENT (this "Agreement") is entered into effective as of the 30th of October, 2012, by and between Northern States Power Company, a Wisconsin corporation ("NSPW"), and the City of Ashland, a Wisconsin municipal corporation (the "City").

### *RECITALS*

A.    NSPW and the City have been identified by the United States Environmental Protection Agency ("EPA") as potentially responsible parties pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675 ("CERCLA") for the alleged release of hazardous substances at the Ashland/Northern States Power Lakefront Site ("Site") described in the attached Exhibit A.  The City and NSPW may be referred to herein individually as a "Party" or collectively as "the Parties."

B.    The City owns some or all of the portion of the Site shown on Exhibit B ("City Property").

C.    The State of Wisconsin ("State") claims ownership of part of the City Property, as former lakebed.

D.    The State and the City intend to enter into a lease ("Lease") of the former lakebed to the City.

E.    NSPW has entered into a consent decree ("CD") with EPA and the State to perform certain work on a portion of the Site, as described with more particularity in the CD and the Statement of Work ("SOW"), attached hereto as Exhibit C, and the EPA-approved

Remedial Design Work Plan incorporated therein by reference attached hereto as Exhibit D. Exhibits C and D collectively define the "Work".

F.   Unless otherwise expressly provided in this Agreement, terms used in this Agreement that are defined in the CD shall have the meaning assigned to them in the CD. Pursuant to the terms of the CD, terms used in this Agreement that are defined in CERCLA, or in regulations promulgated under CERCLA, shall have the meaning assigned to them under CERCLA or such regulations.

G.   The City desires to cooperate with NSPW and EPA to facilitate the performance of the Work by NSPW as set forth below.

### *AGREEMENT*

THEREFORE, the City and NSPW agree as follows:

1.   ACCESS: The City, to the extent it has the authority to do so, grants to EPA, the State and NSPW and to each of their respective representatives, agents, employees, contractors and subcontractors access at all reasonable times to the City Property for purposes of performing, evaluating and monitoring the Work as provided herein. This Agreement shall not constitute, be interpreted, construed or used as evidence of any admission of liability or responsibility, law or fact, a waiver of any right or defense, nor an estoppel against any Party, by either of the Parties against the other or by any person not a Party. However, nothing in this Section 1 is intended nor should be construed to limit, bar or otherwise impede the enforcement of any term or condition of this Agreement against any Party hereto.

2.   USE OF CITY PROPERTY: The City, to the extent it has the authority to do so, grants to NSPW and its representatives, agents, employees, contractors and subcontractors

permission to enter onto the City Property from time to time for purposes of performing the Work and any and all reasonably necessary activities related thereto. NSPW shall provide a copy of this Agreement to each contractor and subcontractor of NSPW who performs Work on the City Property, and shall ensure that each such party understands and complies with the terms of this Agreement. NSPW shall provide a written semi-annual schedule of access to the City (except in the case of a Hazardous Condition at the City Property, as defined in Section 5 of this Agreement, below) that specifies the dates or duration over which NSPW expects to enter the City Property to perform the Work, during the six-month period that the schedule covers.

3.    SPECIFIC WORK TASKS: To facilitate the Work, the City, to the extent it has the authority to do so, also grants NSPW and its representatives, agents, employees, contractors and subcontractors permission to:

    a.    Raze, remove or relocate trees and other vegetation, structures, fixtures or things on the City Property, including, but not limited to, the former wastewater treatment plant, consistent with the Work and EPA approved work and design plans;

    b.    Abandon, remove or otherwise close the artesian wells on the City Property;

    c.    Erect fences or other barriers or boundary markers to designate active Work areas or to further delineate Exclusion Zones, for the purpose of excluding the public from the City Property as and to the extent required by EPA, except for designated City representatives and designated City contractors that shall have access to the City Property as provided in Section 9 hereof;

3

d.    Modify and/or relocate City utility facilities within the City Property and St. Claire Street in a way that maintains their functionality consistent with existing standards of utility design and construction otherwise employed by the City in its utility projects, including review of plans before work and inspection of work.  Prior to commencement of such work, NSPW shall provide HAZWOPER training to the City's Public Works Director and four other employees to be designated by the City such that they can enter Exclusion Zones and Work Areas as necessary to respond to breaks and otherwise perform repair and maintenance of City utilities.  NSPW shall provide HAZWOPER training to additional City employees only (i) if the nature or scope of NSPW's planned activities changes in such a way that additional employees may be required for repair or maintenance or (ii) upon the death or disability of one of the trained City employees during the Construction Period.  City employees so trained shall be permitted to enter the Site for repair or maintenance of utilities and shall comply with the HASP described in Section 9(c) hereof;

e.    Close by placing and maintaining appropriate signage and barriers at the portion of St. Claire Street, 3rd Avenue E., Monks Lane (aka, Marina Drive/Pulp Hoist Road), and recreational trails as and to the extent necessary for the Work while maintaining vehicular access to all parcels on St. Claire Street and 3rd Avenue E. not owned by NSPW and temporarily restrict traffic (but not close) Ellis and Prentice Avenues as and to the extent necessary for the Work while maintaining vehicular access to the City's marina, the public boat launch and campground.

f.      Construct and maintain a temporary haul road from St. Claire Street north onto the City Property to facilitate the performance of the Work;

g.      Erect or install and operate and maintain containment walls; containment features; sheet piling; bulkhead walls and associated support tiebacks; soil borings; monitoring, injection and extraction wells; piping, treatment facilities and structures; collection trenches and monitoring stations; material management pads; interim and final surface and subsurface engineered caps or infiltration barriers; electric power, natural gas, and water and wastewater utility connections/buildouts; and other facilities or features necessary or convenient to facilitate the performance of the Work;

h.      Excavate, treat and/or dispose of certain material or debris on and from the City Property, including demolition and wood debris along the shoreline, and to operate and install facilities and features on the property as necessary or convenient to facilitate the performance of the Work, including without limitation a thermal desorption treatment unit, and material management working pad;

i.      Backfill excavations, grade and restore disturbed surfaces of the City Property to seed and establish temporary vegetative cover and/or interim or final engineered caps or infiltration barriers or covers; and,

j.      Perform long-term operation, monitoring and maintenance of the Work unless and until EPA determines that the Work is complete, or unless and until the City and NSPW mutually agree that the City shall undertake such long-term obligations itself in place of NSPW; provided, however, that NSPW shall use reasonable efforts to limit its exclusion of the public to Work areas, or to limit the total area

5

designated as Exclusion Zones except to the extent necessary, reasonable and appropriate to facilitate the operation, monitoring and maintenance of the Work or as may otherwise be required by EPA.

4.                                    REDACTED

5.                                    REDACTED

REDACTED

11.   RIGHTS OF EPA AND WISCONSIN DEPARTMENT OF NATURAL RESOURCES

("WDNR"):  The City grants EPA and WDNR access to the City Property at all times to

conduct any activity related to the SOW, the Work, or the CD including, but not limited

to, the following:

a.    Monitoring the Work;

b.    Verifying any data or information submitted to the EPA or the WDNR;

c.    Conducting investigations regarding contamination at or near the Site;

d.    Obtaining samples;

e.    Assessing the need for, planning, or implementing additional response actions at

or near the Site;

f.    Assessing implementation of quality assurance and quality control practices;

g.    Implementing the Work;

h.    Inspecting and copying records, operating logs, contracts, or other documents

maintained or generated by NSPW in performance of the Work;

i.    Implementing, monitoring, maintaining, reporting on, and enforcing any institutional controls and the requirements of the ICIAP; and,

j.    Determining whether the Site or other real property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted.

Nothing herein shall be read to limit the rights of EPA or WDNR under CERCLA or any other applicable statute or regulation.

12.                                      REDACTED

13.                                      REDACTED

14.                                      REDACTED

REDACTED

18.   LONG TERM STRUCTURES:  Certain structures ("Long Term Structures") will remain
on the City Property following the Construction Period as necessary for Operation and
Monitoring.   Such Long Term Structures may include, but not be limited to, a
containment wall(s), extraction and monitoring well facilities, groundwater conveyance
and treatment facilities, and the like.  The Long Term Structures shall comply with the
following requirements:

a.    Buildings shall be of quality finish materials including, but not limited to, brick,
stone, stucco, wood, and architectural concrete.  Composite boards manufactured
from wood or other products, such as hardboard or hardplank, may be used when
the board product is less than six (6) inches wide.  Where horizontal siding is
used, it must be shiplap or clapboard siding composed of boards with a reveal of
three (3) to six (6) inches, or vinyl or aluminum siding that is in a clapboard or

**CITY OF ASHLAND**

By: *Willa C Whalen*

Name: WILLIAM C. WHALEN

Title: Mayor

Date: 10-30-12

ACKNOWLEDGEMENT

STATE OF WISCONSIN

COUNTY OF Ashland, WI

Personally came before me this *30* day of *October*, 2012, the above-named (Name/Title) *William Whalen - Mayor*, to me known to be the person and official who executed the foregoing instrument and acknowledged the same.

*Mary Carness*

Print name Mary Carness

Notary Public, State of Wisconsin

My Commission March 32, 2016

[Signature Page to Cooperation and Access Agreement]

**NORTHERN STATES POWER COMPANY**

By: _____

Name: _____
MARK STOERING
Title: _____
PRESIDENT & CEO
NORTHERN STATES
Date: _____
POWER CO.

ACKNOWLEDGEMENT

STATE OF WISCONSIN

COUNTY OF _Eau Claire_

    Personally came before me this _31_ day of _October_____, 2012, the above-named (Name/Title) _Mark Stoering, President & CEO_____, to me known to be the person and official who executed the foregoing instrument and acknowledged the same.

_Jean C Fox_
Print name _Jean C Fox_
Notary Public, State of Wisconsin
My Commission _4-6-14_

[Signature Page to Cooperation and Access Agreement]

# TAB A

**Exhibit A**

Ashland/Northern State Power Lakefront Site means:

The Ashland/NSP Lakefront Site (CERCLIS # WISFN0507952) is located in Ashland, Ashland County, Wisconsin. The Site consists of land and sediment located along the shore of Lake Superior, in Ashland, Wisconsin. The Site contains: (i) property owned by Northern States Power Company, a Wisconsin corporation (d.b.a. Xcel Energy, a subsidiary of Xcel Energy Inc. (NSPW)); (ii) a portion of Kreher Park, a City-owned property fronting on the bay that includes the former municipal waste water treatment plant (WWTP); (iii) an inlet of Chequamegon Bay containing contaminated sediment directly offshore from the former WWTP; (iv) a railroad right-of-way owned by the Wisconsin Central Ltd., and formerly owned by the Soo Line Railroad; and (v) Our Lady of the Lake Church/School, as well as private residences. The Site is bounded by US Highway 2 (Lake Shore Drive) to the south, Ellis Avenue and its extension to the City marina to the west, Prentice Avenue and its extension to a boat launch to the east, and a line between the north termini of the marina and the boat launch to the north.

Record of Decision (EPA, 2010), pg. 1.

Exhibit A



This drawing is neither a legally recorded map nor a survey and is not intended to be used as one. This drawing is a compilation of records, information and data used for reference purposes only.

**SOURCE OR NOTES:**
1. Coordinate System - WI83-NF
2. USGS 1:24K DRG: Ashland West, WI

**Foth** | **Envirocon**
Joint Venture

NORTHERN STATES POWER COMPANY

**FIGURE 1-1**

SITE LOCATION MAP
PHASE 1 PRE-DESIGN STUDY WORK PLAN
ASHLAND/NSP LAKEFRONT SITE

| Date: OCTOBER 2012 | Revision: | |
|---|---|---|
| Drawn By: ADM | Checked By: BCH | Scope: 12X001 |

0    1,000    2,000
Feet

10/09/2012 - 9:43am adm1  X:\GIS\IE\2012\12X001\GIS\dwg\12X001_SiteLocation WI83-NF.dwg

# TAB B



# EXHIBIT B

Property owned by City of Ashland

DISCLAIMER: This map is not guaranteed to be accurate, correct, current, or complete and conclusions drawn are the responsibility of the user.

Source: Ashland County GIS Database 12/2011

# TAB C

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA and                    :
THE STATE OF WISCONSIN,                         :
                                                :
         Plaintiffs,                            :
                                                :          Civil Action No. _____
             v.                                 :
                                                :
NORTHERN STATES POWER COMPANY,                  :
                                                :
         Defendant.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CONSENT DECREE BETWEEN THE UNITED STATES, WISCONSIN, NORTHERN STATES POWER COMPANY, AND THE BAD RIVER AND RED CLIFF BANDS OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS

# TAB D

# Phase 1 Remedial Design Work Plan
# Ashland/NSP
# Lakefront Site

**Prepared for**

## NSPW
## Eau Claire, WI

**May 2012**
**Project 58638**

**Prepared by**

# Burns & McDonnell Engineering Company, Inc.
# Chicago, Illinois

# EXHIBIT 2

Excerpt from First Amendment of Cooperation and Access Agreement
Northern States Power Company and The City of Ashland
April 7, 2014

# FIRST AMENDMENT OF
# COOPERATION AND ACCESS AGREEMENT

## RECITALS

A.   The City of Ashland, Wisconsin ("City") and Northern States Power Company ("NSPW") are parties to the Cooperation and Access Agreement ("Access Agreement") effective as of the 30th of October, 2012.

B.   Pursuant to the Access Agreement, and subject to its terms, the City granted NSPW access to certain property for the purpose of performing certain work pursuant to a Consent Decree Between the United States, Wisconsin, Northern States Power Company, and the Bad River and Red Cliff Bands of the Lake Superior Tribe of Chippewa Indians filed in the United States District Court for the Western District of Wisconsin on 8 August 2012 as document number 2-1 in case number 3:12-cv-00565 ("Consent Decree").

C.   NSPW anticipates entering into an Administrative Order on Consent ("AOC") with the United States to perform the additional work described in the Wet Dredge Pilot Study Work Plan attached as Exhibit E.

D.   The City is willing to accommodate the additional work.

## AGREEMENT

Therefore, the City and NSPW agree as follows:

1.   The Access Agreement shall be amended to provide that the term "Work" includes the work described in Exhibit E in addition to the work performed pursuant to the Consent Decree.

2.   The amendment described in section 1 above shall be effective upon the effective date of the AOC to perform the Work described in Exhibit E.

3.   In the event the AOC does not become effective by October 31, 2014, this Agreement shall be void and of no effect.

(Signature pages follow.)

**CITY OF ASHLAND**

By _____

Print Name _PETE MANN_____

Title _CITY ADMINISTRATOR_____

Date _MARCH 25, 2014_____

ACKNOWLEDGEMENT

STATE OF WISCONSIN

COUNTY OF _Ashland_

Personally came before me this _25th_ day of _March_____, 2014, the above named (Name/Title) _Peter Mann, City Administrator_, to me known to be the person and official who executed the foregoing instrument and acknowledged the same.

_____

Print Name _Kim Westman_

Notary Public, State of Wisconsin

My Commission _May 8, 2016_

(SEAL)

C:\Users\pmann.COAWI.000\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\F6JKTSSI\3343175-First Amendment of Cooperation and Access Agreement betw City  NSPW.DOCX
0325140603

2

**NORTHERN STATES POWER COMPANY,
A WISCONSIN CORPORATION**

By _____

Print Name   MARK STOERING

Title   PRESIDENT & CEO
NORTHERN STATES
POWER CO.

Date   4-7-14

ACKNOWLEDGEMENT

STATE OF WISCONSIN

COUNTY OF Eau Claire

Personally came before me this 7 day of April, 2014, the above named (Name/Title) Mark Stoering, Pres. & CEO, to me known to be the person and official who executed the foregoing instrument and acknowledged the same.

Print Name   Jean C Fox
Notary Public, State of Wisconsin
My Commission   3-31-18

(SEAL)



EXHIBIT E

# WET DREDGE PILOT STUDY WORK PLAN

# ASHLAND LAKEFRONT SUPERFUND SITE

**Prepared for**

U.S. Environmental Protection Agency Region 5

77 W. Jackson Blvd., C-14J

Chicago, Illinois 60604

**Prepared by**

Anchor QEA, LLC

20646 Abbey Woods Court, Suite 205

Frankfort, Illinois 60423

On behalf of

Northern States Power Wisconsin

**February 2014**

# EXHIBIT 3

Excerpt from Second Amendment of Cooperation and Access Agreement
Northern States Power Company and The City of Ashland
May 21, 2015

## SECOND AMENDMENT OF
## COOPERATION AND ACCESS AGREEMENT

## RECITALS

A.  The City of Ashland, Wisconsin ("City") and Northern States Power Company ("NSPW") are parties to the Cooperation and Access Agreement ("Access Agreement") effective as of the 30th of October, 2012, as amended pursuant to that certain First Amendment of Cooperation and Access Agreement ("First Amendment"), which became effective on May 9, 2014.

B.  Pursuant to the Access Agreement, as amended and subject to its terms, the City granted NSPW access to certain property for the purpose of performing certain work pursuant to (i) a Consent Decree Between the United States, Wisconsin, Northern States Power Company, and the Bad River and Red Cliff Bands of the Lake Superior Tribe of Chippewa Indians filed in the United States District Court for the Western District of Wisconsin on 8 August 2012 as document number 2-1 in case number 3:12-cv-00565 ("Consent Decree") and (ii) an Administrative Order on Consent ("AOC") to perform a wet dredge pilot study in Chequamegon Bay ("Wet Dredge Pilot Study").

C.  NSPW anticipates entering into an Administrative Order on Consent ("Breakwater AOC") with the United States to perform additional work to construct a breakwater on the lakebed of Lake Superior (the "Breakwater"), in order to advance the Wet Dredge Pilot Study and/or the full-scale remedy for the Site.

D.  The City is willing to accommodate the additional work for the Breakwater.

## AGREEMENT

THEREFORE, the City and NSPW agree as follows:

1.  The Access Agreement shall be amended to provide that the term "Work" includes the work related to the construction of the Breakwater described in the "Pre-Final Design for Ashland Breakwater" (attached hereto as Exhibit F), as may be amended in the approved final design, in addition to the work performed pursuant to the Consent Decree and AOC.

2.  The amendment described in Section 1 above shall be effective upon the written approval of the United States Environmental Protection Agency ("EPA") to perform the Work described in Exhibit F, as amended in the approved final design.

3.  In the event the EPA does not grant approval to construct the Breakwater, this Agreement shall be void and of no effect.

[Signature pages follow]

**CITY OF ASHLAND**

By: _Debra S. Lewis_

Name: _Debra S. Lewis_

Title: _Mayor_

Date: _5/19/15_

## ACKNOWLEDGEMENT

STATE OF WISCONSIN

COUNTY OF _Ashland_

    Personally came before me this _19th_ day of _May_____, 2015, the above-named (Name/Title) _Debra S. Lewis, mayor_____, to me known to be the person and official who executed the foregoing instrument and acknowledged the same.

_Kim Westman_

Print name _Kim Westman_

Notary Public, State of Wisconsin

My Commission _May 8, 2016_

**NORTHERN STATES POWER COMPANY**

By: _____

Name: *MARK STOERING*

Title: *PRESIDENT, NSPW*

Date: *05/21/15*

## ACKNOWLEDGEMENT

STATE OF WISCONSIN

COUNTY OF *Eau Claire*

Personally came before me this *21* day of *May*, 2015, the above-named (Name/Title) *Mark Stoering President, NSPW*, to me known to be the person and official who executed the foregoing instrument and acknowledged the same.

Print name *Jean C Fox*
Notary Public, State of Wisconsin
My Commission *3-31-18*

JEAN C. FOX
NOTARY
PUBLIC
STATE OF WISCONSIN

**EXHIBIT F TO COOPERATION AND ACCESS AGREEMENT**

Report

# Pre-Final Design for Ashland Breakwater

**Ashland/NSP Lakefront Site**
**Project I.D.:  15X001**

## NSPW
## Eau Claire, Wisconsin

**April 2015**



# EXHIBIT 4

Excerpt from Cooperation and Settlement Agreement
Northern States Power Company and The City of Ashland
April 27, 2016

REDACTED

6.   **Access.**

f.   The Access Agreement is hereby amended to provide that the term "Work" includes work required by the Amended Pilot AOC effective as of the date the Amended Pilot AOC is executed by the EPA, provided that the EPA executes the Amended Pilot AOC on or before June 1, 2016.

g.   The Access Agreement is hereby amended to provide that the term "Work" includes work required by the Phase II CD effective as of the date the Phase II CD is executed by the EPA, provided that the Phase II CD is executed by the EPA on or before April 30, 2018.

3

12.   **Other Agreements**.  Nothing in this Agreement affects or limits the Parties' rights and obligations under any other agreement between the Parties.  In particular, but without limitation, the Breakwater Agreement dated as of May 19, 2015, and the Access Agreement remain in full force and effect.

13.   **Council Approval**.   This Agreement, including the direction to the Mayor in paragraph 5.b, has been approved by a majority vote of the City's Common Council.

CITY OF ASHLAND

By: _Debra S. Lewis_

Name: _Debra S. Lewis_

Title: _Mayor_

Date: _4/27/16_

NORTHERN STATES POWER COMPANY

By: _Mark S._

Name: _Mark Stoering_

Title: _President_

Date: _4/26/16_

8

# APPENDIX D

**CERCLA Financial Assurance Financial Test:**
**Sample CFO Letter (for Test Alternative 2)**
**[To be printed on PRP/Settling Defendant's letterhead]**

[**Insert date**]

U.S. Environmental Protection Agency Region [**insert number**]
c/o [**insert appropriate Regional official such as "Superfund Division Director"**]
[**Insert address**]
[**Insert contact information**]

Dear [**insert EPA recipient identified above**]:

I am the chief financial officer of [**insert name of PRP/Settling Defendant**] (the "Company"). This letter is in support of the Company's use of a financial test to demonstrate financial assurance for the obligations of the Company under that certain [**insert as appropriate:** "Consent Decree," "Administrative Settlement Agreement and Order on Consent," or "Settlement Agreement"] dated [**insert date**], [**insert as appropriate:** civil action number for consent decrees or EPA docket number for administrative agreements], between the Company and the U.S. Environmental Protection Agency (EPA), for the [**insert site name [operable unit]**] Site (hereinafter, the "Settlement Agreement"), entered pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675. This letter confirms the Company's satisfaction of certain financial criteria, as set forth more fully below, that makes the Company eligible to utilize the financial test as financial assurance under the Settlement Agreement.

[*Fill out the following paragraphs regarding CERCLA settlements and unilateral orders, RCRA facilities, TSCA facilities, SDWA facilities, and associated financial assurance requirements. If the Company has no CERCLA settlement, order, or RCRA/TSCA/SDWA facility obligations that belong in a particular paragraph, write "None" in the space indicated. For each settlement, order, and site/facility, include identifying information (civil action/docket number, site/facility/spill identification number, etc.) and the financial assurance dollar amount associated with such settlement, order, and/or site/facility.*]

1.      The dollar amount of financial assurance required by Paragraph [**insert applicable paragraph number**] of the Settlement Agreement and covered by the Company's use of the financial test $[**insert dollar amount**].

2.      The Company is a signatory or respondent to the following CERCLA settlements (other than the Settlement Agreement) or unilateral administrative orders, respectively, under which the Company is providing financial assurance to EPA through the use of a financial test. The total dollar amount of such financial assurance covered by a financial test is equal, in the aggregate, to $[**insert dollar amount**], and is shown for each such settlement or order as follows: [**insert information as necessary**].

3.      The Company is the owner and/or operator of the following facilities for which the Company has demonstrated financial assurance to EPA, states, and/or other regulators in the United States through the use of a test equivalent or substantially equivalent to the test certified herein, including but not limited to hazardous waste Treatment, Storage, and Disposal (TSD) facilities under 40 CFR parts 264 and 265, Municipal Solid Waste Landfill (MSWLF) facilities under 40 CFR part 258, Underground Injection Control (UIC) facilities under 40 CFR part 144, Underground Storage Tank (UST) facilities under 40 CFR part 280, and Polychlorinated Biphenyl (PCB) storage facilities under 40 CFR part 761. The total dollar amount of such financial assurance covered by a financial test is equal, in the aggregate, to $[**insert dollar amount**], and is shown for each such facility as follows: [**insert information as necessary**].

4.      The Company guarantees to EPA, states, and/or other regulators in the United States the CERCLA settlement or unilateral administrative order obligations and/or the MSWLF, TSD, UIC, UST, PCB, and/or other facility obligations of the following guaranteed parties: [**insert information as necessary**]. The total dollar amount of such CERCLA settlement or order obligations and regulated facility obligations so guaranteed is equal, in the aggregate, to $[**insert dollar amount**], and is shown for each such settlement, order, and/or facility as follows: [**insert information as necessary**].

5.      The Company [**insert** "is required" or "is not required"] to file a Form 10K with the Securities and Exchange Commission for the Company's latest fiscal year.

6.      The Company's fiscal year ends on [**insert month and day**]. I hereby certify that the figures for the following items marked with an asterisk are derived from the Company's independently audited, year-end financial statements for its latest completed fiscal year, ended [**insert date**], and further certify as follows:

 A.  The aggregate total of the dollar amounts shown in Paragraphs 1 through 4 above equals $[**insert dollar amount**].

 B.  The current rating of the Company's senior unsecured debt is [**insert as appropriate either:** [AAA, AA, A, or BBB] as issued by Standard and Poor's or [Aaa, Aa, A or Baa] as issued by Moody's Investor Services].

 *C.  Company's tangible net worth equals: $[**insert dollar amount**].

 *D.  Company's total assets in the United States equal (required only if less than 90% of Company's assets are located in the United States.): $[**insert dollar amount**].

 E.  Is line C at least 6 times line A? (Yes/No): [**insert yes or no**].

 F.  Is line C at least $10 million? (Yes/No): [**insert yes or no**].

 G.  Are at least 90% of Company's assets located in the United States? (Yes/No): [**insert yes or no**]. If "No," complete line H.

H.  Is line D at least 6 times line A? (Yes/No): [**insert yes or no**].

I hereby certify that, to the best of my knowledge after thorough investigation, the information contained in this letter is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

By [signature]:       _____
Printed name:         _____
Title:                _____
Address:              _____
Contact information:  _____
Date:                 _____

**CERCLA Financial Assurance Financial Test:**
**Sample CPA Report (for Test Alternative 2)**
[**To be printed on CPA's letterhead**]

**Independent Accountants' Report**
**on Applying Agreed-Upon Procedures**

To the Board of Directors and Management of [**insert name of PRP/Settling Defendant**]:

We have performed the procedures outlined below, which were agreed to by [**insert name of PRP/Settling Defendant**] (the "Company"), to assist the Company in confirming selected financial data contained in the attached letter from [**insert name of CFO**], the Company's Chief Financial Officer, dated [**insert date**], to [**insert EPA recipient (Region, name, and title)**] (the "CFO Letter"). We have been advised by the Company that the CFO Letter has been or will be submitted to the United States Environmental Protection Agency (EPA) in support of the Company's use of a financial test to demonstrate financial assurance for the Company's obligations under that certain [**insert as appropriate:** "Consent Decree," "Administrative Settlement Agreement and Order on Consent," or "Settlement Agreement"] dated [**insert date**], [**insert as appropriate:** civil action number for consent decrees or EPA docket number for administrative agreements], between the Company and EPA, for the [**insert site name [operable unit]**] Site (hereinafter, the "Settlement Agreement"), entered pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675. The procedures outlined below were performed solely to assist the Company in complying with the financial assurance requirements contained in the Settlement Agreement.

This agreed-upon procedures engagement was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of those parties specified in this report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

The procedures we performed and our associated findings are as follows:

1.      We confirm that we have audited the consolidated financial statements of the Company as of and for the fiscal year ended [**insert date**] in accordance with United States generally accepted accounting principles (such audited, consolidated financial statements, the "Audited Financials"). Our report dated [**insert date**], with respect thereto, is included in the Company's [**insert year**] Annual Report on Form 10-K.

2.      Using data set forth in the Audited Financials, we calculated the amount of the Company's tangible net worth as of [**insert date**] as $[**insert dollar amount**], by

[subtracting the amount of net intangible assets of $[**insert dollar amount**] from the amount of total stockholders' equity of $[**insert dollar amount**]]. We compared the amount of the Company's tangible net worth as so calculated with the amount set forth in Line 6(C) of the CFO Letter ("Tangible Net Worth"), and found such amounts to be in agreement.

3.      [**Insert either:** "We compared the amount of the Company's total assets located in the United States as of [**insert date**] of $[**insert dollar amount**] (as such amount was derived by the Company from its underlying accounting records that support the Audited Financials and notified to us in writing) with the amount set forth in Line 6(D) of the CFO Letter, and found such amounts to be in agreement[.]" or "We calculated the percentage of Company assets located in the United States as of [December 31, 20__] by dividing the amount of the Company's total assets located in the United States of $[**insert dollar amount**] (as such amount was derived by the Company from its underlying accounting records that support the Audited Financials and notified to us in writing) by the amount of the Company's total assets as defined and set forth in the Audited Financials, and found such percentage to be greater than 90%."]

4.      Our calculation of the amount of the Company's tangible net worth (as set forth in Line 2 above) is [**insert either:** "greater than or equal to" or "less than"] $10 million.

5.      The dollar amount identified in Line 6(A) of the CFO Letter is hereinafter referred to as the "Financial Assurance Amount." Our calculation of the amount of the Company's tangible net worth (as set forth in Line 2 above) is [**insert either:** "greater than or equal to" or "less than"] an amount calculated as six times the Financial Assurance Amount.

6.      [**Include and complete Line 6 only if less than 90% of Company's assets are located in the United States**] Our calculation of the amount of the Company's total assets located in the United States (as set forth in Line 3 above) is [**insert either:** "greater than or equal to" or "less than"] an amount calculated as six times the Financial Assurance Amount.

[Remainder of page left blank intentionally.]

The foregoing agreed-upon procedures do not constitute an audit of the Company's financial statements or any part thereof, the objective of which is the expression of opinion on the financial statements or a part thereof. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the Board of Directors and Management of the Company and is not intended to be and should not be used by anyone other than these specified parties; *provided, however*, that we acknowledge and agree that the Company may provide this report to EPA in support of the Company's financial assurance demonstration under the Settlement Agreement.

By [signature]:   _____
Printed name:     _____
Title:            _____
Address:          _____
Contact information:  _____
Date:             _____